# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **MARK D. WEST, WILLIAM J. STOUT,** | § | |
| **JACOB S. PILGRIM, PILGRIM HOLDINGS,  LLC,** | § | |
| **PROSPER HOLDING, LP, and PSALM  ONE** | § | |
| **DEVELOPMENTS, LP,** | § | |
| **Plaintiffs,** | § | |
| **v.** | § | **Civil Action** |
| | § | |
| **SCANTECH HOLDINGS, LLC, SCANTECH** | § | **No. _____** |
| **SECURITY, LLC f/k/a IDENTIFICATION** | § | |
| **BEAM SYSTEMS, LLC, SCANTECH** | § | |
| **IDENTIFICATION BEAM SYSTEMS, LLC,** | § | |
| **SIBS INVESTOR, LLC, JGD MANAGEMENT** | § | |
| **CORP. d/b/a YORK CAPITAL MANAGEMENT,** | § | |
| **BRANT EDWIN FROST, IV, FIRST LIBERTY** | § | |
| **BUILDING & LOAN, LLC,   FIRST LIBERTY** | § | |
| **CAPITAL PARTNERS, LLC, FIRST LIBERTY** | § | |
| **CAPITAL, LLC, DANIEL B. COWART, DOLAN** | § | |
| **P. FALCONER, JR., HENRY D. SUTHERLIN,** | § | |
| **JOHN REDMOND, and JAMES A. BLACKWELL,** | § | |
| **Defendants.** | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Mark D. West ("West"), William "Jerry" Stout ("Stout"), Jacob S. Pilgrim ("Jacob Pilgrim"), Pilgrim Holdings, LLC ("Pilgrim Holdings"), Prosper Holding, LP ("Prosper Holding"), and Psalm One Developments, LP ("Psalm One") sue Defendants ScanTech Holdings, LLC ("ScanTech"), ScanTech Security, LLC f/k/a Identification Beam Systems, LLC ("IBS"), ScanTech Identification Beam Systems, LLC ("New ScanTech"), SIBS Investor, LLC ("SIBSI"), SGD

Management Corp. d/b/a York Capital Management ("York"), Brant Edwin Frost, IV ("Frost"), First Liberty Building & Loan, LLC ("Liberty B&L"), First Liberty Capital Partners, LLC ("Liberty Partners"), First Liberty Capital, LLC ("Liberty Capital"), Daniel B. Cowart ("Cowart"), Dolan P. Falconer, Jr. ("Falconer"), Henry D. Sutherlin ("Sutherlin"), John Redmond ("Redmond"), and James A. Blackwell ("Blackwell") and would respectfully show the Court:[1]

## I.     THE PLAINTIFFS

1.    Plaintiff Mark D. West ("**West**") is a resident of Ooltewah, TN and a citizen of the State of Tennessee.

2.    Plaintiff William "Jerry" Stout ("**Stout**") is a resident of Cleveland, TN and a citizen of the State of Tennessee.

3.    Plaintiff Jacob S. Pilgrim, ("**Jacob Pilgrim**") is a resident of Dallas, TX and a citizen of the State of Texas.

---

[1] This case involves many of the same Parties in *First Citizens Bank and Trust Company, Inc. v. ScanTech Holdings, LLC, Identification Beam Systems, LLC, Daniel B. Cowart, John Redmond, James A. Blackwell and Dolan P. Falconer*, Civil Action No. 1:11-cv-196-RWS in the United States District Court for the Northern District of Georgia, Atlanta Division, filed January 20, 2011, involving ScanTech's and its guarantors' January 15, 2010 defaults on $4,300,420.44 in loans to First Citizens Bank f/k/a Georgian Bank. That lawsuit was settled and dismissed in June of 2011 after York and SIBSI funded New ScanTech and paid off the loans to First Citizens Bank. Plaintiffs' loans to ScanTech were not paid.

4.     Plaintiff Pilgrim Holdings, LLC ("**Pilgrim Holdings**") is a limited liability company formed under the laws of the State of Texas, with Aaron M. Pilgrim, a resident and citizen of the State of Texas, as its sole member.

5.     Plaintiff Prosper Holding, LP ("**Prosper Holding**") is a limited partnership formed under the laws of the State of Texas.  Integrity Management Services, Inc. ("**Integrity Management**"), a corporation formed under the laws of the State of Texas with its principal place of business in Texas, is the managing general partner of Prosper Holding, and Lindy M. "Buddy" Pilgrim ("**Pilgrim**"), Jacob Pilgrim and Aaron M. Pilgrim, all residents and citizens of the State of Texas, are the limited partners in Prosper Holding.

6.     Plaintiff Psalm One Developments, LP, ("**Psalm One**") is a limited partnership formed under the laws of the State of Texas.  Integrity Management is the managing general partner of Psalm One, and Pilgrim, Jacob Pilgrim and Aaron M. Pilgrim are limited partners in Psalm One.

## II.     THE DEFENDANTS

7.     Defendant ScanTech Holdings, LLC ("**ScanTech**") is a limited liability company formed under the laws of the State of Georgia.  ScanTech may be served by serving its registered agent, Dolan P. Falconer, at 75 Fifth Street, Suite 430, Atlanta, GA 30308, or wherever he may be found.  ScanTech held itself

out to the public[2] as "a <u>world leader</u> in state-of-the-art Electron Beam Accelerator and X-Ray technologies… for homeland security and industrial applications," falsely represented itself to Plaintiffs as the *sole* owner of Defendant IBS, authorized its agents to misrepresent facts in order to solicit loans from Plaintiffs, entered into promissory notes with Plaintiffs, defaulted on the notes without making a single payment of interest or principal, and then colluded for the transfer of the collateral securing the notes to a third party without Plaintiffs' approval and for the purpose of hindering and defeating Plaintiffs' ability to collect on the debts owed to them by ScanTech.

8.      Defendant ScanTech Security, LLC is a limited liability company formed under the laws of the State of Virginia and formerly known as Identification Beam Systems, LLC ("**IBS**").  IBS's principal office in the State of Georgia is at 75 Fifth Street, Suite 430, Atlanta, GA 30308, but IBS has failed to identify its registered agent to the Georgia Secretary of State.  As a result, service on IBS may be made by serving the Georgia Secretary of State or by serving its current CEO, Member, Director and most recently identified registered agent, Dolan P. Falconer, at 75 Fifth Street, Suite 430, Atlanta, GA 30308, or wherever he may be found.  IBS was held out to the public as a "subsidiary company of

---

[2] *See* www.scantechholdings.com Home, About Us, and IBS pages.

ScanTech Holdings, LLC" responsible for "Inspection Systems" for airports and cargo,[3] and was falsely represented to Plaintiffs by IBS's authorized agents as a "wholly owned" subsidiary of ScanTech which held collateral for Plaintiffs' notes.

9.     Defendant ScanTech Identification Beam Systems, LLC ("**New ScanTech**") is a limited liability company formed under the laws of the State of Delaware.  New ScanTech may be served by serving its registered agent, Dolan P. Falconer, at 75 Fifth Street, Suite 430, Atlanta, GA 30308, or wherever he may be found.  New Scan Tech was formed in May of 2011 at the instance of SIBS Investor, LLC, ScanTech, and certain ScanTech and IBS insiders for the purpose of assuming "substantially all of [the] assets" of, and the business conducted by, IBS and to serve as the entity into which new investment capital would be contributed[4]—instead of such capital being contributed into ScanTech, as was previously represented to Plaintiffs would be done.  New ScanTech is the entity into which collateral securing Plaintiffs' notes was fraudulently transferred in collusion with agents, affiliates, directors and officers of Defendants New ScanTech, SIBS Investor LLC, JGD Management Corp., ScanTech and IBS.

10.     Defendant SIBS Investor, LLC ("**SIBSI**") is a limited liability company formed under the laws of the State of Delaware and doing business in the

---

[3] *Id.*

[4] Preamble to the <u>Amended and Restated Limited Liability Company Agreement</u>.

<u>**PLAINTIFFS' ORIGINAL COMPLAINT—PAGE 5**</u>

State of Georgia.  SIBSI has failed to identify its registered agent to the Georgia Secretary of State.  As a result, service on SIBSI may be made by serving the Georgia Secretary of State or by serving any of its officers, members or managers at 75 Fifth Street, Suite 430, Atlanta, GA 30308, or wherever any of them may be found.  SIBSI was formed for the purpose of seizing control of New ScanTech (and of the assets of ScanTech and IBS) through SIBSI's complete control of two-thirds of the votes of New ScanTech's Board of Directors—which SIBSI holds and controls at as long as it owns Series A interests in New ScanTech.[5]   SIBSI was organized by, and operates under the complete control of, agents of Defendant JGD Management Corp. d/b/a York Capital Management.

11.     Defendant JGD Management Corp. d/b/a York Capital Management ("**York**") is corporation formed under the laws of the State of Delaware with its principal place of business located at 767 Fifth Avenue, 17th Floor, New York, New York 10153.  York's agent for service of process is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808.  York is an experienced, international, multi-billion dollar New York investment banking firm.

---

[5] Section 7.02 of <u>Amended and Restated Limited Liability Company Agreement of New Scan Tech</u>.  *See also*, page 1, paragraph 1 in which SIBSI is identified and officially referred to as "York" for further reference therein, thus affirming that Defendants York Capital Management and SIBSI are effectively one and the same and **indistinguishable** in terms of the exercise of control over New ScanTech.

<u>PLAINTIFFS' ORIGINAL COMPLAINT</u>—PAGE 6

It sourced the investment capital that funded SIBSI, and thereby New ScanTech, and controls all matters related to both of them.  York, through SIBSI and New ScanTech, knowingly and willingly participated in the scheme to fraudulently transfer collateral securing Plaintiffs' notes from IBS to New ScanTech without securing its release by Plaintiffs.  York then caused the transfer of the collateral for the purpose and with the intent of hindering Plaintiffs' ability to collect the debts owed them and evidenced by the notes.  Defendant York also colluded with officers and agents of ScanTech and IBS to *exclude* the notes from being paid with proceeds of the capital raise; all while paying ScanTech's and IBS's obligations to insiders.  Defendant York tortiously interfered with Plaintiffs' contracts and induced ScanTech's and IBS's breach of obligations to Plaintiffs, despite the fact that the "bridge" funds provided by and through Plaintiffs' notes were a necessary lifeline that kept ScanTech and IBS afloat long enough to secure the York capital.

12.     Defendant Brant Edwin Frost, IV ("**Frost**") is a citizen of the State of Georgia who may be served at his place of business at 14 Greenville Street, Suite B, Newnan, GA 30263, or wherever he may be found.  Frost is an officer, owner and the authorized agent of Defendants First Liberty Building and Loan, LLC, First Liberty Capital Partners, LLC, and First Liberty Capital, LLC, and of various similar assumed names, including First Liberty Building & Loan, First Liberty

Capital, FirstLibertyGA, and Liberty Capital, (any or all of which may hereinafter be referred to at times as the "**First Liberty Defendants**") through all of which Frost conducts financing and investment banking activities,[6] and through which Frost served at all times herein referenced as an authorized agent of ScanTech, IBS, their officers, and his close personal friend, Defendant Daniel B. Cowart, a founding member of ScanTech. Frost was Plaintiffs' primary solicitation contact and knowingly or negligently made fraudulent, inaccurate, incomplete and negligent material representations to them while soliciting the loans to Scan Tech.

13.     Defendant First Liberty Building and Loan, LLC ("**Liberty B&L**") is a limited liability company formed under the laws of the State of Georgia.  First Liberty B&L may be served by serving its registered agent, Keith Logue, at 3423 Weymouth Court, Marietta, GA 30062, or wherever he may be found.  Frost acted as an authorized agent of Liberty B&L in soliciting Plaintiffs' loans.

14.     Defendant First Liberty Capital Partners, LLC ("**Liberty Partners**") is a limited liability company formed under the laws of the State of Georgia.  First

---

[6] *See* www.firstlibertyga.com. "Focus" webpage reports First Liberty's 50 years of investment banking experience ranges from $500,000 to over $20,000,000, with its "sweet spot" being $2 to $15 million, and "Experience" webpage touts bringing *"value added financing solutions to clients with needs as diverse as… The world's finest airport baggage security company*," a reference to ScanTech and IBS, and a false representation given that there has never been even one single sale of such airport scanning equipment completed by ScanTech, IBS or New ScanTech.

Liberty Partners may be served by serving its registered agent, Keith Logue, at 3423 Weymouth Court, Marietta, GA 30062, or wherever he may be found.  Frost acted as an authorized agent of Liberty Partners in soliciting Plaintiffs' loans.

15.     Defendant First Liberty Capital, LLC ("**Liberty Capital**") is a limited liability company formed under the laws of the State of Georgia.  First Liberty Capital may be served by serving its registered agent, Keith Logue, at 3423 Weymouth Court, Marietta, GA 30062, or wherever he may be found.  Frost acted as an authorized agent of Liberty Capital in soliciting Plaintiffs' loans.

16.     Defendant Daniel B. Cowart ("**Cowart**") is a citizen of the State of Georgia who may be served at 10695 Bell Road, Duluth, GA 30097, or wherever he may be found.  Cowart is a founding member of ScanTech and IBS, a Director of each, and a non-executive insider for whom a preferential, non-dilutable equity stake in New ScanTech was negotiated along with the transfer of Plaintiffs' collateral out of IBS into New ScanTech.  Cowart, his family and their trusts are also members in IBS, directly holding 21.81%.  Combined with other IBS insiders, Cowart left only about 72.72% of IBS ownership to be held by ScanTech, despite representations to Plaintiffs that IBS was a "wholly owned" subsidiary of ScanTech.  The non-ScanTech ownership of IBS meant that 21.81% of Plaintiffs' notes went to the benefit of Cowart's personal stake in IBS, and 5.47% benefitted

other insiders.[7]  Cowart, the largest investor in ScanTech and IBS, recruited and authorized his close friend Frost to make representations and solicit Plaintiffs' loans in order to carry ScanTech and IBS through to the major capital raise. Cowart authorized and knew or should have known of Frost's numerous material false representations and failures to disclose to Plaintiffs.  As a ScanTech and IBS Board Member, Cowart authorized Plaintiffs' notes executed under false pretenses. Cowart was a <u>personal guarantor</u> of multi-million dollar financial obligations of the Borrower that *were paid off* (to Cowart's direct benefit) using proceeds of the York capital raise—to the exclusion of Plaintiffs' notes.

17.    Defendant Dolan Falconer, Jr. ("**Falconer**") is a citizen of the State of Georgia who may be served at 210 Hamden Trace SW, Atlanta, GA 30331, or wherever he may be found.  Falconer is an officer, founding member and director of ScanTech and IBS, President and CEO of ScanTech, a director of New ScanTech, and the most highly compensated officer (President and CEO) of New ScanTech.  He received a preferential, non-dilutable equity stake in New ScanTech negotiated along with the transfer of Plaintiffs' collateral out of IBS into New ScanTech.  He is the officer responsible for, and knowledgeable of, all business and financial matters of ScanTech and IBS and knew or should have known of the

---

[7] IBS Equity Interest table first revealed in the June 2011 "<u>Offer to Exchange Existing Debt Instrument</u>," provided to Lenders in June of 2011.

<u>PLAINTIFFS' ORIGINAL COMPLAINT</u>—PAGE 10

material, false representations made to Plaintiffs by Frost and other authorized agents of ScanTech and IBS.  He directly supplied false information to Frost for his solicitation of Plaintiffs' loans.  As a Board Member, he authorized the notes executed under false pretenses.  He was a <u>personal guarantor</u> of certain financial obligations of the Borrower that *were paid off* (to Falconer's direct benefit) using proceeds of the York capital raise—to the exclusion of Plaintiffs' notes

18.    Defendant Henry D. Sutherlin ("**Sutherlin**") is a citizen of the State of Georgia who may be served at 75 Fifth Street, Suite 430, Atlanta, GA 30308, or wherever he may be found.  Sutherlin is an officer, founding member and Director of ScanTech and IBS, and Secretary and Treasurer of ScanTech.  As the person at ScanTech and IBS responsible for accounting and financial matters, he received a preferential, non-dilutable equity stake in New ScanTech negotiated along with the transfer of Plaintiffs' collateral out of IBS into New ScanTech.  He knew or should have known of the numerous material, false representations made to Plaintiffs by Frost and other authorized agents of ScanTech and IBS.  As a Board Member, he authorized the notes and security agreements executed under false pretenses.

19.    Defendant John Redmond ("**Redmond**") is a citizen of the State of Maryland who may be served at 7312 Brookstone Court, Potomac, MD 20854, or wherever he may be found.  Redmond is a major investor, member and Director of

ScanTech and IBS, and received a preferential, non-dilutable equity stake in New ScanTech negotiated along with the transfer of Plaintiffs' collateral out of IBS into New ScanTech.   Redmond, his family and their trusts are among the largest investors in ScanTech and IBS and as such directly benefitted by soliciting Plaintiffs' loans to carry ScanTech and IBS through to the major capital raise. Redmond knew or should have known of the numerous false, inaccurate and incomplete representations made to Plaintiffs by Frost and other authorized agents of ScanTech and IBS.   As a Board Member, Redmond authorized the notes and security agreements, executed under false pretenses.   Redmond was also a personal guarantor of multi-million dollar financial obligations of ScanTech and IBS that *were paid off* (to Redmond's direct benefit) using proceeds of the York capital raise—to the exclusion of Plaintiffs' notes.

20.    Defendant James A. Blackwell ("**Blackwell**") is a citizen of the State of Georgia who may be served at 311 Hardage Drive, Marietta, GA 30064, or wherever he may be found.   Blackwell is a major investor, member and former Director of ScanTech and IBS and a personal guarantor of certain financial obligations of ScanTech and IBS that *were paid off* (to Blackwell's direct benefit) using proceeds of the York capital raise—to the exclusion of Plaintiffs' notes.

**PLAINTIFFS' ORIGINAL COMPLAINT—PAGE 12**

### III.      JURISDICTION AND VENUE

21.    This Court has original jurisdiction over this civil action pursuant to 28 U.S.C. §1331, because it arises under the laws of the United States.

22.    In addition or in the alternative, this Court has original jurisdiction pursuant to 28 U.S.C. §1332(a)(1), because the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and this action is between citizens of different States, because Plaintiffs are all citizens of the States of Tennessee and Texas and none of the individual Defendants is a citizen of either Tennessee or Texas, and none of the members of the Defendant limited liability companies is, to Plaintiffs' knowledge, a citizen of either Tennessee or Texas. Defendant York is a citizen of the States of Delaware and New York.

23.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over Plaintiffs' state-law causes of action asserted in this civil action because they are so related to Plaintiffs' claims in this civil action within the Court's original jurisdiction that they all form part of the same case or controversy under Article III of the United States Constitution.

24.    This Court has *in personam* jurisdiction over the Defendants because they conduct business in this District and Division and the events giving rise to Plaintiffs' claims occurred or were located in this District and Division.

25.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a)(2) and (b)(2), as the District in which a substantial part of the events or omissions giving rise to the claim occurred.

## IV.     FACTUAL ALLEGATIONS

### A.     Overview

26.     This case is about a series of defaulted **Junior Secured Convertible Promissory Notes** (the "**Notes**") totaling four hundred fifty thousand dollars ($450,000.00) of principal entered into by Plaintiffs with ScanTech and IBS (ScanTech and IBS defined collectively in the Notes as "**Borrower**") in reliance upon materially false, inaccurate and incomplete representations to Plaintiffs that were fraudulently or, in the alternative, negligently made to them by the authorized agents, affiliates, officers and directors of the Borrower, all of whom knew or, alternatively, should have known that such representations were false, inaccurate and incomplete.  Such representations were not one-time, inadvertent statements but were instead part of a prolonged pattern of repetitive, gross misstatements, distortions and omissions of material fact designed to completely mask the true risk levels associated with ScanTech and to grossly overstate Plaintiffs' potential return on investment—all in order to induce Plaintiffs to lend $450,000 to Borrower in exchange for the Notes.

27. This case is about a business commonly referred to as "ScanTech," but more appropriately referred to as "ScamTech." According to representations made by Defendants to Plaintiffs, ScanTech has three main product lines:

a) Large transportable and fixed site scanning systems for the non-intrusive inspection of large vehicles and cargo shipping containers to identify, accurately detect, locate and discriminate hidden contraband materials….

b) Smaller baggage scanning systems to be used in such areas as airport security, entrance to critical buildings, etc. to identify, accurately detect, locate and discriminate hidden contraband materials….

c) Efficient, low-loss Klystron-based, high-energy E-Beam Accelerators and X-ray sources with very high pulse-to-pulse…[8]

28. ScanTech has repeatedly failed to achieve the financial and operating standards and goals represented to Plaintiffs, substituting a shell-game of excuses while misusing borrowed funds and protecting insider interests to the direct harm of Plaintiffs (hereinafter referred to at times collectively as "**Lenders**").

29. This case involves Borrower's undisputed, material defaults on each of the Lenders' Notes and breaches of contract with respect to payments owed on principal and interest, not any portion of which has ever been paid to Lenders.

30. Additionally, after default, Borrower and Defendants York/SIBSI, jointly colluded and conspired, through their sophisticated, authorized agents,

---

[8] ScanTech Holdings/Identification Beam Systems – <u>Offer to Exchange Existing Debt Instrument</u>, Description of IBS, at page 1.

affiliates, officers and directors, to fraudulently transfer certain assets of the Borrower, in which the Plaintiffs held a security interest (the "**Secured Assets**"), to the ownership of New ScanTech, under the control of Defendants York/SIBSI. Defendants made such transfer without releasing Lenders' security interests and with full knowledge that the Secured Assets were transferring in direct violation of the terms of the Lenders' Limited Security Agreement ("**Security Agreement**").

31.   The Secured Assets were falsely represented to Lenders as being accounts receivable ("**A/R**") from an actual sale by Borrower, approved for payment,[9] rather than simply an uncompleted purchase order as was the true case.

32.   The Notes were falsely represented to be specific-purpose six-month operating "bridge" loans[10] to a forthcoming major capital raise which would adequately capitalize ScanTech.  Instead, Borrower misdirected Note proceeds to pay past due obligations of Borrower that Borrower failed to reveal to Lenders prior to Lenders' $450,000 funding of Borrower in exchange for the Notes.

33.   Borrower's authorized agents hid completely from the Lenders

---

[9] Email from Defendant Frost on March 24, 2010, 4:51 pm stating, *"Your investment will be secured by a $1.25M A/R from Abu Dhabi.  This A/R has now been approved for payment upon delivery, machines should be delivered and monies in hand within 90 days.  Your investment will then be secured by US dollars in a US bank."* (emphasis added)

[10] ScanTech Holdings – Executive Summary – January 13, 2013 provided to Plaintiffs by Defendant Frost.

material facts, including its dire financial straits and dire need of cash both immediately before and after receiving the funding from Lenders, its repeated brushes with total insolvency, its defaults with many of its creditors, some of whom had commenced litigation (including its bank which held a $4.82 million defaulted obligation), tax liens filed against it by the Internal Revenue Service, and that it was also in default on its contractual business agreement in the United Arab Emirates ("**UAE**"), the business associated with the Secured Asset.[11]

34.   Additionally, authorized agents of the Borrower fraudulently lured Lenders to participate in the Notes through false representations as to the state of the business being conducted by Borrower, the market valuation of the business and the Lenders' potential return on investment—masking not simply normal business risk but the true, financially-devastated condition of the business.  After default on the Notes, Borrower and the other Defendants did nothing to protect the Lenders' interests but instead entered into agreements that selectively paid certain creditors (who were guaranteed by insiders) while paying nothing on the Notes, provided bonus equity to insiders, and stripped IBS of the Secured Assets, all to the detriment and damage of the Lenders.

---

[11]  Material facts revealed to Plaintiffs in June of 2011 only after Borrower's defaults on the Notes. *See* ScanTech Holdings, LLC minutes of Board of Directors meeting for February 10, 2010, June 25, 2010 and July 10, 2010, and ScanTech Holdings, LLC letter to Members dated June 30, 2011 from Defendant Falconer.

B.   **The Notes**

35.    In reliance on materially false representations made to them by Defendant Frost and other authorized representatives of Borrowers, Plaintiff West and Plaintiff Stout each loaned $100,000 to Borrowers on or about March 4, 2010 by means of a Note for that amount and a Security Agreement related thereto.  All principal and interest on their Notes matured September 4, 2010.  Borrowers are in default on the Notes to West and Stout.

36.    In reliance on materially false representations made to Pilgrim by Defendant Frost and other authorized representatives of Borrowers, Prosper Holding, Psalm One, Pilgrim Holdings and Jacob Pilgrim, respectively, loaned $75,000, $50,000, $100,000 and $25,000 to Borrowers on or about April 30, 2010 by means of four Notes in those amounts and four Security Agreements related thereto. All principal and interest on those Notes matured October 30, 2010. Borrowers are in default on each of those Notes.

37.    Each of the Notes is identical in terms and conditions, differing only in their principal amount, effective date and above-described maturity date ("**Maturity**").   Each Note includes a "Participating Premium" consisting of Cashless Warrants for a percentage equity interest in the Borrower equivalent to 37.5% of the principal amount of the Note as a pro-rata portion of a $15,000,000

valuation of the Borrower.  Each Note bears an initial simple interest rate of 8.0% per annum and has a term of six months.

38.     At the option of the Lender, at any time before Maturity, each Note is convertible to an equity percentage interest in the Borrower based on the face value of the Note as a pro-rata portion of the aforementioned $15,000,000 valuation. Such voluntary conversion forfeits the interest earned.  Each Note converts to an equity interest as described above if the Lender does not elect, between ten and 30 days before Maturity, to receive repayment of the Note, but all Lenders elected to receive repayment rather than convert his/its Note to equity, and such elections were confirmed by the Borrower.  When a Note is in default at maturity, the annual interest rate increases to 15%, and the Lender on the Note is due additional Cashless Warrants, based on 10% of the outstanding Note balance, pro-rata to the aforementioned valuation.  If the Note is not repaid on or before 180 days after Maturity, the Lender is due additional Cashless Warrants based on 15% of the outstanding Note balance, pro-rata to the aforementioned valuation.

39.     **Borrower—ScanTech and IBS—has affirmed each Note's default status, made no payments of principal or interest thereon, and afterward represented that each Lender would be made whole in principal and interest, but has failed to do so.**  Each Note contains provisions for recovery of reasonable

<u>PLAINTIFFS' ORIGINAL COMPLAINT—PAGE 19</u>

attorneys' fees if it is placed in the hands of an attorney for collection. Each Note is governed by Georgia law, waives trial by jury, and provides for exclusive jurisdiction in this Court or a Georgia state court sitting in Atlanta, GA.

**C.**    **The Solicitations and False Representations Begin**

40.    Commencing in January of 2010, Pilgrim and West were separately approached via interstate email and telephone communications from their mutual acquaintance, Defendant Frost, with proposals for them each to invest in ScanTech. At no time during the solicitation process did Defendant Frost mention IBS or represent IBS as a business for which he was soliciting funds. Defendant Frost's email and an attached ScanTech Holdings, LLC Executive Summary (the "**Executive Summary**") referenced only "ScanTech Holdings, LLC," "ScanTech" and his "friend Dan Cowart's company, ScanTech"[12]

**D.**    **The Executive Summary**

41.    The Executive Summary was an investment solicitation prospectus in which Defendant Frost, presenting himself and the First Liberty Defendants[13] as

---

[12] Defendant Frost's emails of January 13, 2010 to West and January 19, 2010 to Pilgrim, with the attached ScanTech Holdings, LLC Executive Summary.

[13] In all cases Defendant Frost's communications to Plaintiffs include some form of representation or reference to the First Liberty Defendants. Virtually every email bore the signature line, *"Brant Frost, IV, First Liberty Building and Loan, Newnan, GA, 770-253-4300 office, 404 664-9086 cell, bf4@firstlibertyga.com."*

authorized agents of Defendant ScanTech, referred to himself and the First Liberty Defendants, stating:  "We are assisting them [ScanTech] with a $1M private placement…."[14] (emphasis added).  Defendant ScanTech and its officers, directors, agents and affiliates, including Defendants Cowart, Falconer, Sutherlin and Redmond, were fully aware of Defendant Frost's role as an authorized agent acting on behalf of Borrower, and of Frost's false representations to induce Plaintiffs.

42.    In his two initial interstate emails and the Summary, Defendant Frost established from the outset, through intentional or negligent misrepresentations, a pattern and practice of **grossly overstating the expected return** on the Notes, **masking the true risk involved**, **inaccurately characterizing the state of ScanTech's business**, and misleading West and Pilgrim as to the true nature of the loans sought and as to the **intended use of the funds** obtained.

## E.    Frost's Interstate Solicitations

43.    Defendant Frost made fraudulent and/or negligent misrepresentations, overstating ScanTech's value and understating the risk of lending to ScanTech. Overstating the market value of ScanTech was integral to solicitation of the Notes, because they included Cashless Warrants for equity.  In addition, a company with a

---

Other documents bore "First Liberty Capital" or "First Liberty Partners" with the same contact information.

[14] Executive Summary attached to Defendant Frost's emails of January 13, 2010 to West and January 19, 2010 to Pilgrim.

rapidly increasing market value would be perceived by Plaintiffs as having no problem paying the Notes in full and on time. Defendant Frost, acting on behalf of the above-named Defendants, misrepresented in interstate telephone calls and emails to Pilgrim and West the following:

a. "We have a rare opportunity… to participate in a limited… investment offering  in a $20M high tech homeland security company [Defendant ScanTech] that we believe offers a 3 fold 4 month return."

b. "Projected 3 to 1 return in 90-120 days."

c. "We are offering… F&F [Friends and Family] placement of $1M with a company valuation of only $10M… co valuation of only $10M for this round to make it very attractive to investors, $30M min co valuation in 90 days when co goes to NY for institutional raise..."

d. STH's investment banker, Taylor, is represented as using "a valuation pre-money of $30M+" to raise institutional money.

e. "You can either stay in for the 12-36 mo run up, or cash out your $ for $ investment in 90-180 days, and leave the rest in for the run up."

f. "Cash invested in company to date-$20M, Friends/Family Valuation this raise-$10M, Projected Market Value Mar 2010-$30M, Projected Market Value Jan 2011-$100M, Projected Market Value Jan 2013-$500M."

g. "…this investment offers a potential 3 to 1 return over the next 4 months, and potentially 30 to 1 over the next 36 months."

## F.     The Abu Dhabi Account Receivable

44.     Defendant Frost, acting on behalf of the above-named Defendants, fraudulently and/or negligently misrepresented ScanTech's business, falsely

representing that its primary product (which, Plaintiffs have now learned, was still in the Research & Development stage) had in fact *already been* "validated" and "chosen" for use by the government of Abu Dhabi ("**AD**") in the UAE.  This false or negligent misrepresentation with respect to AD is central to all of the fraudulent and/or negligent misrepresentations made to Plaintiffs, because the AD so-called A/R was the Secured Asset that was to secure the Lenders' Notes:

   a. "ScanTech has developed a "best in Class" airport screening system that far surpasses anything on the market today."

   b. "ScanTech has developed, built and now successfully tested the best airport screening system of its kind in the world."

   c. "Their design has been validated and chosen by the government of [AD]"

   d. "Abu Dhabi has now wired deposits for [purchase] of 5 systems… They have invited ST to come back to AD later this month to negotiate/sign a Letter of Intent for the next 20-100 systems.  The Purchase Order for this [next 20-100 system] contract should be finalized by April 1st."

   45.    Defendant Frost, acting on behalf of and through the above-named Defendants, misrepresented the Notes as 6-month Friends & Family "bridge" loans—to a major capital raise—to fund ScanTech's operations and construction of two test units necessary for bidding on a $350M Transportation Security Administration ("**TSA**") contract.  As Defendants now know, the Note proceeds were instead used largely to pay past due debts, including payments to insiders

(like borrowing a friend & family credit card to pay off your own debts), and no

TSA test units were built using the Note proceeds or submitted for TSA testing:

a.  "$1M **bridges** the company [until] the AD P/O [for 20-100 units] is in hand [in April], and the institutional money comes in."  (emphasis added)

b.  "Its **funds** [on-going] **operations** till then…" (emphasis added)

c.  "It also **funds construction of two more [test] units** for… the TSA… [as] part of the bidding process for a 1400 unit, $350M TSA contract." (emphasis added)

d.  "This… helps ScanTech participate in this TSA contract, for which only 6 companies in the world have been invited to bid.  ScanTech's minimum share of the contract should be $25-50M or more."

## G.   West's Tour and Meeting with Defendants

46.   In follow up, Plaintiff West, working through Defendant Frost,

scheduled and conducted a due diligence tour and meeting with Defendants Frost ,

Falconer, Sutherlin and Redmond at ScanTech's Buford, GA research facility on

January 20, 2010.  During the meeting, Defendants Frost, Falconer, Sutherlin,

Redmond and other officers and authorized representatives of ScanTech

fraudulently and/or negligently made false, inaccurate, misleading and incomplete

statements about ScanTech, its business, its so-called customers, and its prospects

for multi-million dollar market valuations—all consistent with the false,

inaccurate, misleading and incomplete statements previously made by Defendant

Frost.   Further, Defendants Frost, Falconer, Sutherlin and Redmond omitted

material facts regarding ScanTech's true and dire financial condition, such as its past due taxes, vendor payables, and payroll, and its troubled or defaulted $4.82 million bank loan. None of these Defendants, nor any other agent or officer of Borrower in the meeting, provided any documents or information to Plaintiff West which contradicted the false representations or which revealed the true state of the business or risk involved.

47.    January 22, 2010, Defendant Sutherlin, through Defendant Frost, sent Plaintiff West ScanTech's "latest" Balance Sheet[15] to represent its finances, but **hid from West** the material fact that ScanTech and IBS had **defaulted** on their $4 plus million dollar bank loan January 15, 2010—**just 7 days earlier**.

48.    Although Plaintiff West expressed interest in *loaning* funds to ScanTech, on January 27, 2010, Defendant Frost instead emailed West a <u>*Purchase Agreement*</u> for ScanTech equity. Plaintiff West responded January 31, 2010, repeating terms of a proposed loan to ScanTech loan, as previously discussed.

**H.    <u>Frost's Continued Misrepresentations</u>**

49.    Defendant Frost, acting on behalf of the above-named Defendants, responded February 1, 2010,[16] agreeing to have the transaction revised to reflect a

---

[15] Defendant Sutherlin's January 22, 2010 email copied to Defendant Falconer and forwarded to West by Frost, with a Nov. 2009 ScanTech Balance Sheet attached.
[16] Defendant Frost's email of February 1, 2013 at 9:24:34 am EST.

loan as Plaintiff West had stated.  Defendant Frost emphasized Plaintiff West could get his money back "in 90-180 days, with interest, at the first payoff of the AD A/R or the funding of the $20M institutional raise."[17]   The email reiterated Defendants' false representations that the AD business constituted an actual *sale,* with an associated (existing) A/R.  In fact, as Plaintiffs have since learned, there was no consummated sale to AD, no billing had been issued for such a sale, and there was no actual A/R to be collected yet.

50.   Defendant Frost, acting on behalf of the above-named Defendants, repeated his assertion that any loan would be repaid from proceeds of a large ($20M) institutional raise. However, when the raise occurred in June, 2011, payoffs of all of Plaintiffs' Notes were *expressly excluded* from agreed-to use of funds, as negotiated by Defendants Cowart, Redmond, Blackwell, Falconer and Sutherlin (on behalf of themselves and of ScanTech and IBS), with Defendants York/SIBSI.  Proceeds of the 2011 capital raise were, however, used to pay off other debts of the Borrower that were subject to personal guarantees of Defendants Cowart, Redmond, Blackwell, Falconer and other ScanTech/IBS insiders.

51.   Defendant Frost's February 1, 2010 email also continued his pattern of gross misrepresentation of the risk and reward, representing that a $100,000

---

[17] *Id.*

loan at 8.0% would earn $4,000 interest in 180 days plus $25,000 in Participating

Warrants.  Using the Warrants as *bait* to lure West into making the loan, Frost,

acting on behalf of the above-named Defendants, stated in *unconditional* terms:

> "ScanTech goes 10 to 1 over 12 months, [$]25K becomes [$]250K, hence
> on your [$]100K investment you have [$]104k back plus [$]25k in stock,
> or [$]100K has become [$]345K.  If you opted to leave the [$]100k in, then
> after a 12 mo 10 to 1 run up of course you have $1M."[18]

52.    As Defendants knew, the interest of all Plaintiffs in a Note was not

simply to loan money at 8.0%, but to loan money, *for six months,* secured by

proceeds of the AD A/R, and to thereby gain potential value of the Participating

Premium Warrants.  In "pitching" the loans, Defendant Frost focused inordinately

on the Warrants, and made fraudulent and/or negligent misrepresentations as to the

value thereof, as part of a plan to induce the loans from Plaintiffs.

**I.    Frost Also Ensnares Plaintiff Stout**

53.    Defendant Frost, acting on behalf of the above-named Defendants,

emailed Plaintiff West February 1, 2010, referencing Plaintiff Stout and inquiring,

*"And is Jerry interested?"*  Defendant Frost knew Plaintiff West had been passing

on, and expressly intended for West to pass on, all information to Plaintiff Stout

that Defendant Frost had provided to Plaintiff West.  Defendant Frost knew that

---

[18] *Id.*

Plaintiff Stout was considering making a loan to ScanTech identical to West's and in reliance on the same representations Frost had made to West.

54.     February 2, 2010, Defendant Frost responded in writing[19] to Plaintiff West (and indirectly to Plaintiff Stout) regarding due diligence questions they had posed to Defendant Frost and officers and agents of ScanTech.  Acting on behalf of the above-named Defendants, Defendant Frost affirmed, "yes," regarding whether "the investment <u>is</u> a 'loan' <u>secured</u> by the AD <u>receivables.</u>" (emphasis added). Defendants thus again misrepresented that an A/R with AD actually existed.

55.     In response to Plaintiffs West's and Stout's due diligence regarding risk that the AD A/R might not be collected or the $20M might not be raised, Defendant Frost, acting on behalf of the-above named Defendants, readily offered them the additional Default Warrants "in case of **repayment being delayed** beyond 180 days" (as asked about by West and Stout), because "its likelihood is <u>so remote</u> as to effectively <u>not be a reasonable possibility</u>, so offering it to you <u>costs [us] nothing</u>." (emphasis added)  Frost's response was typical and illustrative of the fraudulent, *dismissive responses* repeatedly made by agents of ScanTech to any and all risk-related due diligence questions posed by West, Stout and by Pilgrim throughout their dealings with Defendants prior to execution of the Notes.

---

[19] Defendant Frost's email, February 1, 2010 at 3:10:18 p.m. EST, to West.

56.     On February 2, 2010, Plaintiff West advised Defendant Frost that Plaintiff Stout had confirmed "that he is definitely in on the deal… but will confirm the dollar amount tomorrow."[20]

## J.    West and Stout Loan $200,000 Based on Lies

57.     March 2, 2010, Defendant Frost, acting on behalf of the above-named Defendants, transmitted a Security Agreement to West and Stout and falsely described it to them.  On the eve of execution of the Notes, Defendant Frost reinforced and perpetuated the false representation that the AD business was a consummated sale to a "customer" which had already resulted in an actual A/R in which West and Stout would have a security interest—a blatant and material lie.[21]

58.     On March 4, 2010, Plaintiffs West and Stout, in good faith reliance upon the representations made to them by and through the above-named Defendants, executed and funded their Notes.  Defendant Frost reaffirmed his official role, through the First Liberty Defendants, as an agent of the Borrower by conveying executed copies of the Notes and Security Agreements and offering his

---

[20] Plaintiff West's email of February 2, 2010 at 9:51 PM to Defendant Frost.

[21] Defendant Frost's email of March 2, 2010 at 1:55 p.m. EST to Plaintiff West, with a copy to Plaintiff Stout, describing the Security Agreement as, "evidenc[ing] the collateral interest you will have in the **Accounts Receivable** from our **customer** in Abu Dhabi." (emphasis added).

assistance with any questions.  Defendant Frost referred to Plaintiffs West and Stout as "business partners who came into this together…."[22]

## K.   Frost Simultaneously Solicited the Pilgrim Plaintiffs

59.    Defendant Frost had approached, through Pilgrim, Plaintiffs Prosper Holding, Pilgrim Holdings, Psalm One and Jacob Pilgrim (hereinafter the "**Pilgrim Plaintiffs**") on behalf of the above-named Defendants about the same time as Frost had approached Plaintiff West.  However, Defendant Frost, acting on behalf of the above-named Defendants, continued to solicit the Pilgrim Plaintiffs' participation through numerous interstate telephone calls and emails.

60.    Defendant Frost referred Pilgrim to Plaintiff West as an investor reference.  Pilgrim discussed ScanTech with West and discovered that he and Stout had been presented with essentially the same representations, conducted a facility tour, and executed Notes thereafter.  Because West had not been provided true and correct information, he had no way of knowing that information he passed on to Pilgrim was materially false.  Defendant Frost, however, knew the information was materially false and also knew that by connecting Pilgrim to West, Pilgrim would be innocently provided false information by West that would induce the Pilgrim Plaintiffs to also loan funds to ScanTech.

---

[22] Defendant Frost's emails of March 4, 2010 at 12:1:58 p.m. EST, 12:13:58 and 7:50:05 p.m. EST, 7:56:55 p.m. EST to Plaintiffs West and Stout.

### L.     The Updated Executive Summary

61.     March 24, 2010, Defendant Frost emailed Pilgrim a revised and updated ScanTech Holdings, LLC Executive Summary (the "**Updated Executive Summary**") approved by Defendants Cowart, Falconer, Sutherlin and Redmond, and resumed his push for Pilgrim Plaintiffs to lend funds to ScanTech.  His email and accompanying Updated Executive Summary, on behalf of all of the above-named Defendants, increased the detail included in his fraudulent and/or negligent misrepresentations, especially regarding the AD A/R and ScanTech market value.[23]

62.     Defendant Frost reaffirmed to Pilgrim the existence of an actual A/R (presenting the AD business as a consummated sale, when he knew, or should have known, it was not), and expressly **represented** that it had even recently been **approved for payment** by the AD government in the specific amount of $1.25 million.  Defendant Frost, acting on behalf of the above-named Defendants, further represented that upon delivery of the ScanTech machines, expected <u>within</u> 90 days, ScanTech would have cash in hand in a United States bank as security collateral.

63.     During the Pilgrim Plaintiffs' due diligence, Pilgrim questioned Defendant Frost by telephone about the A/R.  Frost, acting on behalf of the above-named Defendants, expressly represented to Pilgrim not only that the A/R was

---

[23] Defendant Frost's email of March 24, 2010 at 4:51 p.m. to Pilgrim, with the Updated Executive Summary attached.

already approved for payment by the AD government, but that the $1.25 million would be held as security, in a U.S. bank, rather than simply be spent.  Plaintiffs now know that these representations were fraudulently and/or negligently made, because ScanTech did not even have working capital to fund construction of the machines to sell to AD, nor were the sales or the machine specifications finalized.

64.    Defendant Frost, acting on behalf of the above-named Defendants, used the phrase "*next* sales" in referring to 20-100 machines, to falsely reinforce his representations about **the *first* so-called A/R** to AD:

a. "[AD] invited us back in country in February.  As a result of that very successful trip, we now have both a green light on payment of our A/R and a confirmed path to our **next** sales order of 20-100 machines."

b. "Your investment will be secured by a $1.25M A/R from Abu Dhabi. This A/R has now been approved for payment upon delivery, machines should be delivered and monies in hand within **90 days**.  Your investment will then be secured by US dollars in a US bank."

65.    Defendant Frost falsely represented the risk and reward to the Pilgrim Plaintiffs, expressly representing that lending the funds to ScanTech was safe because the valuations of ScanTech were "very conservative" and "well founded":

a. "Get your investment back in full in 180 days with 8% preferred, plus, cashless warrants equal to 25% of your investment…"

b. "Decide in 180 days to leave your investment in for the run up, which we believe **conservatively will be 10 to 1 in 12 months** and 30-50 to 1 in 36 months."

    c.   "Under scenario # 1, **$100K in brings back… in 12 months = $250K to investor**."  Under scenario # 2, $100K stays in… in 12 months = $1M to investor." (emphasis added)

    d.   "these valuation projections are **very conservative**, and are **well founded**…" (emphasis added)

66.    Defendant Frost, acting on behalf of the above-named Defendants, fraudulent and/or negligently misrepresented that the Pilgrim Plaintiffs' "loans" would be "secured by [an] **existing** A/R", and would simply "**bridge**" ScanTech operations through to an institutional capital raise, then rescheduled for July.  The Pilgrim Plaintiffs materially relied on this to their detriment, because Defendants did not follow through and negotiate repayment of the Notes as a use of funds obtained in the institutional raise, but instead paid off debts personally guaranteed by insider Defendants Cowart, Redmond, Falconer and Blackwell.

## M.   ScanTech's Purportedly Increased Valuation

67.    While working to induce Pilgrim Plaintiffs to lend funds to ScanTech, Defendant Frost changed his ScanTech valuation from $10 million, as previously presented, to $15 million.  This was part of a concerted and calculated effort designed to make it *appear* that ScanTech was rapidly increasing in value, so as to encourage the Pilgrim Plaintiffs to quickly decide to provide the funds, before the company's value further increased. He stated:

"co valuation of $15M for this round.  Inst raise to have a $30M min co valuation pre money in 120 days…"

68.     The Updated Executive Summary attached to Defendant Frost's email made virtually identical misrepresentations to those previously made.  However, it also made an ***additional*, specific and materially false representation** to cover the fact that the AD government had not purchased the machines as previously represented and wanted changes made to machines it was, in reality, only considering for purchase.  Frost's email represented that the modifications required for the AD machines were (i) **cosmetic only**, and (ii) **already in process**, stating: "They invited [ScanTech] back to [AD] last month, and approved payment w/i 90 days of their remaining $1.25M A/P, **pending cosmetic modifications** to the system, which are **in process** now." (emphasis added)

69.     Defendant Frost's representation to Pilgrim, as referenced above, that the valuation of ScanTech had *already* increased from $10 million to $15 million was also made to Plaintiffs West and Stout in a February 18, 2010 mail.[24]  This interstate email affirmed that the source of the above-named Defendants' valuation data was ScanTech's investment banker, Taylor Freres & Cie, SA:  "Our investment banker whose input I needed was traveling most of last week…. To

---

[24] Defendant Frost's email of February 18, 2012 at 5:13:40 p.m. to Plaintiff West.

strengthen our position from a valuation standpoint going into our institutional raise, they [Taylor Freres] decided to value [ScanTech] at $15M …."

70.   This misstatement was, and similar misstatements also were, repeatedly made to Plaintiffs by and on behalf of the above-named Defendants in order to create, fraudulently or negligently, the false impression that things were going so well at ScanTech that its market value was rising fast.  Frost, on behalf of the above-named Defendants, agreed to adjust each of Plaintiffs' Participating Premium Warrants to adjust for the original percentage offered at a $10 million valuation of ScanTech, after this bogus raising of its value to $15 million.

## N.   **Plaintiffs' Collateral Was Already Pledged**

71.   Each of Plaintiffs' Security Agreements expressly represented that the collateral (proceeds from the AD A/R) was free and clear of all other liens and security interests.[25]  However, documents obtained in June of 2011 indicate that all of ScanTech's and IBS's assets were *already* pledged to other creditors.[26]

---

[25] Section 4.1 of each of the Limited Security Agreements states: "Grantor represents and warrants that the Collateral is free and clear of all liens, security interests and other interests in the Collateral, other than the Security Interest granted to Secured Party hereunder."
[26] A ScanTech Holdings, LLC letter to members dated June 30, 2011 from Defendant Falconer disclosed $4.82 million in debt was *"secured by substantially all assets of the Company."* (emphasis added).

72.    Defendant Redmond directly engaged in self-dealing and insider preferences and aided and abetted the above-named Defendants in making the misrepresentations upon which Plaintiffs relied in their decisions to participate in the Notes.  Specifically, on or about September of 2008, with the full knowledge and approval of Defendant Redmond, the Samantha Redmond Trust, an existing Member of ScanTech, loaned ScanTech $1.0 million, with such loan being secured by the same AD purchase order later used to secure Plaintiffs' Notes.[27]  As cited above, each of Plaintiffs' Security Agreements declares the collateral to be "*free and clear of all liens, security interests and other interests,*" yet Defendant Redmond, a member of the Board of ScanTech, knew that the Samantha Redmond Trust held a pre-existing lien worth 80% of the potential value of the AD purchase order at the time Plaintiffs executed their Security Agreements, and that such lien had not been released.  In the ScanTech Board meeting at which the Notes and Security Agreement were approved by the Board, Defendant Redmond knowingly voted to authorize the Notes and Security Agreements entered into by Plaintiffs

---

[27] *See* "*Fundrasing Matters*" of <u>FY 2008 Year-end Status Report To The Members of ScanTech Holdings, LLC</u>, distributed March 6, 2009 stating, "*The [$1.0 million] loan provides the Samantha Redmond Trust with an additional 2% Percentage Interest in the Company as an investment incentive and is secured against the UAE [i.e., Abu Dhabi] purchase order.*" (emphasis added).  Plaintiffs were first given access to this information in June of 2011.

based on the fraudulent or negligent representation that there was no pre-existing lien in the Secured Assets.  He did so to the direct benefit of Samantha Redmond.

## O.    The Pilgrim Plaintiffs' Due Diligence with Frost and Falconer

73.    On April 8, 2010, Pilgrim and his son Aaron Pilgrim, the sole member of Plaintiff Pilgrim Holdings, conducted a lengthy due diligence conference call with Defendants Frost and Falconer wherein Frost and Falconer reaffirmed all of Frost's previous false statements about ScanTech and continued to hide the true and dire state of the business.  In follow up, Defendant Frost emailed Pilgrim and Aaron Pilgrim, affirming that the Security Agreement would give them a *"lien on the A/R from Abu Dhabi"* and touting *"…the trajectory we are on…"*[28]

74.    Attached to Defendant Frost's April 8, 2010 email was the form of Note, in which Pilgrim Investors first learned of Defendant IBS's involvement as a party to the loan transaction.  Pilgrim asked Defendant Frost about IBS's relationship to ScanTech in a follow up telephone call and was assured that IBS was a *"**wholly owned**"* subsidiary of ScanTech used strategically as a *"silo"* in

---

[28] Defendant Frost's April 8, 2010 5:46 p.m. email to Buddy and Aaron Pilgrim with ScanTech Convertible Notes attached.  Defendant Frost stated, *"Good speaking with you both today. Attached pls find the investment document which will memorialize your investment in ScanTech… I will forward to you the Limited Security Agreement which will formalize your lien on the A/R from Abu Dhabi. We are very excited about… the trajectory we are on…"*

which to house the airport security business and to allow it to be spun off in the future for the benefit of ScanTech investors.

## P.   Defendants Fail to Disclose ScanTech's Dire Financial Condition

75.   With regard to the Pilgrim Plaintiffs, just as with Plaintiffs West and Stout, Defendants and their authorized agents, affiliates, officers and directors *at all times* during the solicitation of the Lenders' participation in the Notes **hid completely** from the Lenders material facts such as that the Borrower was in *"dire financial straits"* and *"dire"* need of cash both immediately before and after receiving the Notes' funding, had *"repeated"* brushes with *"total insolvency,"* was in default with many creditors, some of whom had commenced litigation, had tax liens filed by the IRS, and was also in default on its contractual business agreement in the UAE (the business associated with the Secured Asset).[29]

76.   Defaults with creditors included First Citizens Bank, which held three multi-million dollar joint obligations of ScanTech and IBS, all of which matured unpaid and in technical default January 15, 2010.[30]   It is not coincidental that the

---

[29] *See* ScanTech Holdings, LLC, Minutes of Board of Directors Meeting February 10, 2010, June 25, 2010 and July 10, 2010, and ScanTech Holdings, LLC, letter to members of June 30, 2011 from Defendant Falconer, all made available June 2011.
[30] Page 11 of "ScanTech Identification Beam Systems Series (A) Preferred Indicative Investment Terms" investment presentation prepared by Taylor Freres & Cie, SA, first provided to Lenders only in June of 2011, revealing $4.4 million in aggregate outstanding senior debt (principal only) composed of three separate

default event was separated by only two business days from Defendant Frost's January 13, 2010 solicitation of Plaintiff West and Frost's January 19, 2010 solicitation of Pilgrim—yet neither West nor Pilgrim was informed of the situation with the bank loans at the time of Defendant Frost's initial solicitation, <u>nor *at any time* prior to Plaintiffs' execution of the Notes</u>.  As with Plaintiffs West and Stout, the failure to advise the Pilgrim Plaintiffs of default on the loans from First Citizens Bank was a material, intentional omission of fact that Defendants had a duty to disclose to Plaintiffs prior to their making the loans to ScanTech and IBS.

## Q.    <u>The Pilgrim Plaintiffs Are Ensnared</u>

77.    On April 13, 2010, Pilgrim emailed Defendant Frost to confirm their telephone conversation earlier that day regarding Pilgrim's family's intent to loan ScanTech $250,000.  Pilgrim specifically stated his <u>*reliance upon*</u> Frost's most recent representation of ScanTech as described in Defendant Frost's April 13, 2010 email.    In particular, Pilgrim referenced Frost's representations regarding ScanTech's "Valuation."[31]    In the telephone conversation, Defendant Frost

---

credit facilities, all of which matured January 15, 2010, were in technical default, and on which the company received formal notice of default September 7, 2010.

[31] Pilgrim's April 14, 2010 11:34 a.m. email to Defendant Frost, stating: *"This is just a quick note to confirm our phone conversation regarding ScanTech, LLC investment.  My family intends to invest a total of $250,000 in ScanTech… <u>as most recently described in your 4/13/2010 4:07 pm email RE: ScanTech Valuation</u>."* (emphasis added)

repeated his false assertion that IBS was in fact a wholly-owned business subsidiary of ScanTech, set up as a "silo" for facilitating a future spin-off 100% for the benefit of ScanTech.  However, IBS was only 72.72% owned by ScanTech, with the balance owned by insiders.[32]  This omission hid the fact that the Note proceeds went 27.28% to the benefit of insiders.

78.    During the April 13, 2010 telephone conversation, Pilgrim expressly asked Defendant Frost if Frost was confident enough in his friend Dan Cowart's company so as to invest a *substantial* amount of his own money in the business. Defendant Frost replied, ***"Absolutely!"***  Frost went on to claim that although he had *"not bet the <u>entire farm</u> on ScanTech,"* he had in fact, already *"bet a <u>substantial part of the farm</u> on it"* by making a personal loan to ScanTech, *"similar in size to what Pilgrim was considering,"* and he had already elected to convert 100% of his loan to equity.  Pilgrim relied upon Frost's testimonial and representation of his own investment in ScanTech when making a decision regarding the Pilgrim Plaintiffs' participation in the Notes.[33]  However, documents made available to Lenders in July of 2011 revealed that Frost loaned *<u>only</u>* $2,500 in the name of Eric Frost and $5,000 in the name of Ben Frost—not close to anything

---

[32] IBS Equity Interest table revealed to Lenders in the June 2011 "<u>Offer to Exchange Existing Debt Instrument</u>."
[33] *Id.*

like the Pilgrim Plaintiffs' $250,000 and certainly not consistent with Frost's representation that he had bet a *"substantial part of the farm"* on ScanTech.

79.     Defendant Frost's April 13, 2010 email to Pilgrim touted ScanTech's new $15.0 million dollar valuation (up from $10.0 million), and increased the Warrants so as to provide the Pilgrim Plaintiffs with the same percentage equity interest in the supposedly *more valuable* company.  As with Plaintiffs West and Stout, this was all part of the bait to lure mis-informed Lenders into the Notes.

80.     On April 30, 2010 the Pilgrim Plaintiffs, in good faith reliance upon the representations made to Pilgrim by Defendants, executed and funded their Notes in the following amounts:

| | |
|---|---|
| Prosper Holding | $ 75,000.00 |
| Psalm One | $ 50,000.00 |
| Pilgrim Holdings | $100,000.00 |
| Jacob Pilgrim | $ 25,000.00 |

## R.     Post-Investment Communications Slow to a Trickle

81.     Immediately after Plaintiffs funded the loans and executed the Notes, Defendants discontinued any regular communication with the Lenders, first responding on July 8, 2010 to an inquiry initiated by Plaintiff West, and on September 30, 2010 to an inquiry initiated by Pilgrim.  In his reply to Plaintiffs West and Stout, Defendant Frost continued his characteristically false

representations that, *"Things are progressing well at ScanTech,"* [34] in spite of the fact that no real progress had been made with the AD business, with the TSA, or with the major capital raise, and the Borrower was NOT on track to repay the Notes on time.  Frost used the pronouns *"we"* and *"us"* twelve times in his email when referring to ScanTech and IBS, affirming his on-going role with them.

82.   On August 31, 2010,[35] Defendant Frost falsely characterized the situation to West and Stout, stating, *"Bottom line is, ST* <u>*is doing well*</u> *but has not received its money from the UAE. Therefore it cannot pay the Notes."* (emphasis added).   Frost affirmed the Borrower's continuing preferential concern for its insider-owners and its complete disregard for the Lenders by revealing that it had an <u>opportunity to complete a major capital raise</u> (as it had committed to Lenders to do), **<u>but chose not to do so</u>**, of its own volition, because the deal was not as good as the insiders would have liked.[36]   The Minutes of the Board of Directors meetings for February through August 2010 all reveal a business in dire financial trouble and in serious need of cash; not one "doing well."[37]   By choosing not to

---

[34] Defendant Frost's email of July 8, 2010 at 6:38 p.m.to Plaintiffs West and Stout.

[35] Defendant Frost's email of August 31, 2010 at 7:11 p.m. to West and Stout.

[36] *Id.* (stating *"could have done a deal with the Italian conglomerate, Finmeccanica, with whom we had months of discussions… But by the time it came to cutting a check, it was to (sic) rich for them and to (sic) poor for us.* <u>*We decided to say*</u> *"*<u>*no thanks*</u>*, we're not giving away the store."*) (all emphasis added)

[37] *See* ScanTech Holdings, LLC, <u>Minutes of Board of Directors Meeting</u> February

participate in the August capital raise, the Borrower failed to act as it had represented, falsely, to the Lenders that it would do.

83.    On September 1, 2010, Plaintiff West demanded *"full payment on the Maturity date of September 4"* for his and Stout's Notes.[38]  Frost replied to West affirming that the Borrower had been notified of West's and Stout's decisions to (i) not convert their Notes to equity, and (ii) demand payment in full.[39]

84.    On September 4, 2010, the West and Stout Notes went into default, with Borrower never having made any payment of interest or principal.

85.    On October 6, 2010, Pilgrim notified Defendant Frost and Defendants ScanTech and IBS of the election by all Pilgrim Plaintiffs to "cash out" of their Notes rather than elect the "Conversion Equity" option.[40]  The Pilgrim Plaintiffs' notices also made demand on the Borrower for timely payment in full of all

_____

10, June 25, July 29, August 18, 20, 23, 2010, all of which were provided to Lenders only in June of 2011, after default on the Notes, and all of which reveal a business in deep financial distress, and a Board focused on measures which protect only the insiders' interests.

[38] West email of September 1, 2010 at 2:40 p.m. to Frost, with a copy to Stout.

[39] Defendant Frost's email of September 1, 2010 at 5:17 p.m. to West and Stout, acknowledged: "Have notified [ScanTech] of your preference, and will have paperwork readied for the same asap… By electing to keep your [ScanTech] investment on (sic) note form…."

[40] Pilgrim's email of October 6, 2010 at 12:39 p.m. to Frost providing ScanTech – Cash Out Election notices electing the cash out option instead of *"Conversion Equity"* for Plaintiffs Prosper Holding, Psalm One, Pilgrim Holdings, and Jacob Pilgrim, and affirming that original notices dated October 5, 2010 had been sent via certified mail to Defendant Falconer and Michael V. Coleman.

principal and interest due as of the Maturity date, October 30, 2010. Frost responded back to Pilgrim that all notices had been accepted by ScanTech.[41] Each of the Pilgrim Plaintiffs thereafter received an October 19, 2010 letter from Defendant Falconer acknowledging receipt of the cash-out election and informing each that the Note would not be repaid on the Maturity due date.[42]

86.    On October 30, 2010 all Pilgrim Plaintiffs' Notes went into default, with no payment of principal or interest having ever been made thereon.

## S.    Default by ScanTech on the Notes

87.    Under the terms of Plaintiffs' Notes, upon default at Maturity, the interest rate automatically increased from eight percent (8.0%) to fifteen percent (15.0%) per annum, and "First Default Penalty" Cashless Warrants were to be issued to each of them equal to 10% of that Plaintiff's outstanding loan balance pro-rata to a $15,000,000 enterprise value. When the Notes were not repaid within 180 days after Maturity, "Final Default Penalty" Cashless Warrants were to be issued to each of them equal to 15% of that Plaintiff's outstanding loan balance, pro-rata to the $15,000,000 valuation. ScanTech and IBS, as well as Cowart, Falconer, Sutherlin and Redmond, have affirmed the default status of each Note.

---

[41] Frost email of October 21, 2010 at 5:43 p.m. to Pilgrim.
[42] Falconer's October 19, 2010 letters to each Pilgrim Plaintiff regarding default.

**T.** **York Raises $25 Million**

88.    In the Fall of 2010, through its investment banker, Taylor Freres & Cie, SA, Defendants entered into negotiations with Defendant York to raise $25.0 million in equity.  This is the same capital raise Defendants falsely represented to Plaintiffs that would be completed in April and July 2010 (so as to ensure the timely repayment of the Notes), and the same one Defendants refused to consummate with the Italian conglomerate, Finmeccanica in August 2010—all while falling into ever more dire financial straits.  Each of Falconer's default letters to Lenders[43] falsely represented that Lenders would now be repaid from proceeds of such a raise in the first quarter 2011.  This is the perpetuation of a consistent pattern of stating that key funding and business events were just on the horizon— only to have the horizon continually move into the future.[44]

---

[43] Defendant Falconer's October 19, 2010 letters to each Pilgrim Plaintiff regarding default and stating, "ScanTech is presently involved with our Investment Banker, Taylor Freres & Cie, to raise upwards of $25 million in equity for the Company. This effort is expected to take until the end of the year and we anticipate that we will be in a position to repay these notes during the first quarter of 2011."  Such capital raise was actually completed in June 2011, **expressly excluding** the Lenders' Notes for payment, but paying loans guaranteed by Defendants Cowart, Redmond and Blackwell, among others.

[44] Numerous times, Defendants falsely represented that the AD A/R payment was just weeks or months away, as was the "next" AD order for 20-100 machines; yet theses business activities were perpetually pushed off into the future, never to occur.  The same is true of the TSA tests, TSA QPL approval and sales to TSA, not one of which has occurred even to-date, more than three years later.

89.     When ScanTech and IBS did enter into a definitive agreement with York for capital funding, their officers, directors and agents, including Defendants Falconer, Sutherlin, Cowart, Redmond and other insiders, agreed with York/SIBSI to do so through formation of a new entity, New ScanTech.   New ScanTech was formed for the purpose of assuming *"substantially all of [the] assets"* of, and business conducted by, IBS,[45] and as a calculated effort to separate the assets and the anticipated business revenue stream from the debts of the Borrower—and more specifically from the Borrower's obligations and ability to pay Plaintiffs' Notes.

## U.     New ScanTech Is Created

90.     New ScanTech is the new entity into which the Secured Assets were fraudulently transferred through collusion of the authorized agents, affiliates, directors and officers of ScanTech, IBS, New ScanTech, and SIBSI (controlled wholly by York).   York is not an innocent, unwitting, arms-length negotiator of a funding and purchase agreement who did not **know** that it was arranging for the illegal transfer of a collateralized asset (the AD related business receivables) from IBS to New ScanTech without release by the secured party.   Indeed, York is a multi-billion dollar, sophisticated and knowledgeable investment banking firm that well knew the AD business and all future accounts receivables related thereto were

---

[45] Preamble to the <u>Amended and Restated Limited Liability Company Agreement</u>.

pledged to Plaintiffs as collateral for the Notes, and that the Security Interest had

not been released by any of Plaintiffs.[46]

## V.   The Secured Assets Are Stripped Out of ScanTech and IBS

91.    All Defendants, in an attempt to coerce and frighten Lenders into

willingly releasing their Security Interest in the Secured Assets, without any

payment or promise to pay, warned that such failure to release the Secured Assets

would cause the new capital investment to not be consummated, or if the new

investor elected to go forward with funding anyway, threatened that it *would* strip

IBS of all of its assets and leave ScanTech as a non-operating entity.[47]    This

---

[46] *See* "Offer to Exchange Existing Debt Instrument," for Note holders, June 2011, written in negotiation with York and SIBSI specifically to obtain the release of the secured assets from the Lenders, in exchange for certain options which were highly unfavorable to them, acknowledging on page 1, *"Your notes may be secured by funds to be received by the Company's contract in Abu Dhabi, which security will be released by the election of one of the options described."*  (emphasis added).

[47] *Id.* at pages 2-3: "Unless all note holders elect an option (to release their Security Interest) or the proposed new investor (SIBSI, i.e. York) waives this condition, the new investment will not be consummated.  If the proposed investment is not consummated, it is not likely that either IBS or ScanTech will be able to meet its contractual obligations in Abu Dhabi and will not generate sufficient revenue to repay any of the funds due you.  If you decide to take neither of the alternatives and the new investor waives the closing condition described above, your note will remain an obligation of ScanTech, which will be a member of [New ScanTech]. *Note that ScanTech is not an operating entity and will only generate cash from the operations of [New Scan Tech] or other affiliates.  In some cases, your note will also be an obligation of the old IBS, which will no longer have any meaningful assets and will not be an operating entity.*"  (emphasis added)

stripping of assets from IBS would directly violate the Security Agreement.[48]

92.     The *Offer to Exchange Existing Debt Instrument* makes clear that Defendants York and SIBSI not only *knew* that they were planning to wrongfully transfer the Secured Assets out of IBS (otherwise it would not have sought ANY release by the Lenders), but that they also assumed they could either bully the Lenders into submission, or deal with the related liability at a later date if ever challenged—as is now being done in this civil action before this Court.

## W.     The Officers and Directors Protect Only Their Own Self-Interests

93.     Officers, directors and insiders of ScanTech and IBS, including the individual Defendants, knowingly supported this wrongful transfer of secured assets, on false and threatening premises, **all while negotiating for themselves a preferential, non-dilutable 15% equity stake in New ScanTech**.[49]   York and

---

[48] The <u>Limited Security Agreement</u> document of Borrower, Section 4.4., states: "Grantor shall not take any action (or permit or consent to the taking of any action) that might materially impair the value of all or any portion of the Collateral of the rights of Secured Party with respect to the Collateral."

[49] *See* "<u>ScanTech Identification Beam Systems Series (A) Preferred Indicative Investment Terms</u>" investment presentation prepared by Taylor, first provided to Lenders in June 2011, revealing at page 8 an *"Employee Share Option Plan for the key officers, employees, and contractors of the Company (including Key Persons) to be granted…up to 15% of the Company's post money capital"* and a "Capitalisation Table" for non-dilution illustration. *See also* "<u>Offer to Exchange Existing Debt Instrument</u>", at page 2, *"Employee Incentive Plan"* which affirmed that such interests would be granted to *"management, advisors, directors and*

SIBSI used the non-dilutable equity stake to essentially "bribe" the support of the insiders for the illegal asset transfer—and to obtain the insiders' support for not paying the Plaintiffs' Notes with proceeds of the capital raise.

94.    At the same time, the York/SIBSI funding specifically paid debts of ScanTech and IBS that were personally guaranteed by Defendants Cowart, Redmond, Blackwell, Falconer and other ScanTech/IBS insiders.[50]   There is no evidence that the officers, directors and insiders of ScanTech and IBS made any attempt to honor the obligations to the Lenders for the Notes by negotiating a less lucrative deal for themselves.  Defendants Falconer, Cowart, Redmond, Sutherlin and Blackwell and ScanTech's and IBS's other officers and directors intentionally and willfully breached their fiduciary duty to Plaintiffs by authorizing the transfer of the Secured Assets to New ScanTech without Plaintiffs' consent and in order to hinder Plaintiffs' ability to collect the debts evidenced by the Notes.

95.    After default, the Lenders conducted numerous telephone calls and written communications with Defendants Frost, Falconer and other authorized

---

*founders,"* which would include Defendants Falconer, Cowart, Redmond, Sutherlin, Blackwell and other insiders supporting the York proposal.
[50] <u>See</u> pages 10-11 of "<u>ScanTech Identification Beam Systems Series (A) Preferred Indicative Investment Terms</u>" investment presentation document prepared by Taylor, and <u>Letter to Members</u> of June 30, 2011 from Dolan P. Falconer which disclosed a $4.82 million of joint-obligation debt with First Citizens Bank that had been *"guaranteed by several members…."* (emphasis added).

agents of the Borrower. Time after time, the aforementioned agents of the Borrower repeated their earlier claims and representations regarding the AD A/R, approvals and sales with the TSA, and progress on a major capital raise. However, with every repeated representation, the timeline for accomplishment was moved further out. This is a pattern of fraud that has gone on for three long years—always being perpetually six months away from prosperity and success.

## X.    <u>York and SIBSI Induce Breaches and a Fraudulent Transfer</u>

96.    Defendants York and SIBSI are guilty of orchestrating the fraudulent asset transfer and of knowingly taking possession of the Secured Assets without Plaintiffs' release of their security interest in them.

97.    Defendants York and SIBSI also knew that the Notes were originally represented to the Lenders as "bridge" loans to carry the Borrower through to the major capital raise which Defendants York and SIBSI were then funding, yet York's, SIBSI's and New ScanTech's representatives, including the individual Defendants, failed to "bridge" payment of the Notes to the capital raise.[51]

98.    Actions of authorized agents, officers, and directors of ScanTech and IBS intentionally resulted in the breach of contractual obligations to Plaintiffs as

---

[51]   Preamble/WITNESSETH section of the <u>Amended and Restated Limited Liability Company Agreement of SIBS</u>, wherein the Lenders were referred to as *"…certain debtholders of ScanTech Holdings and IBS holding junior secured convertible notes…" and as **Bridge Investors**."* (all emphasis added).

set forth in the Notes and Security Agreements by luring Plaintiffs into participating in the Notes on false pretences and subsequently transferring the Secured Assets out of IBS to New ScanTech without release of Plaintiffs' Security Interests.  By doing so, Defendants conspired to fraudulently transfer any future revenue stream related to the Secured Assets out of IBS and into New ScanTech in direct breach of the Security Agreement.[52]  Defendants York and SIBSI induced ScanTech and IBS to breach its contractual obligations not to impair Plaintiffs' collateral.

### Y.    Falconer Admits the Transfer Was Fraudulent

99.    On September 12, 2011, Defendant Falconer discussed the defaulted Notes with Pilgrim through the following exchange of remarks:[53]

- Falconer, referring to the defaulted secured Notes, said:  *"I know the down side of it.[54] You can, uh, cause us a lot of pain. I understand that, and I'm very sensitive to that."* [55] Pilgrim replied, *"We could make a lot of trouble… because… the assets that we have a lien against… that P.O., we had a claim against that and that shouldn't have been transferred out of there."*  To which Falconer responded, *"Right.*"[56]

---

[52] The Limited Security Agreement document of Borrower, Section 4.4., states: *"Grantor shall not take any action (or permit or consent to the taking of any action) that might materially impair the value of all or any portion of the Collateral of the rights of Secured Party with respect to the Collateral."*

[53] Recorded telephone conversation of September 12, 2011 from 10:00 a.m. to 10:42 a.m. CST, between Pilgrim and Defendant Falconer.

[54] *Id.* at index 139 (emphasis added).

[55] *Id.* at index 205 (emphasis added).

[56] *Id.* at index 281-289 (emphasis added).

- Pilgrim continued, *"You know that was an illegal [transfer]. It is illegal to make a transfer like that when there's a lien against it."* To which Falconer replied, *"I, I again, I believe I understand what's profound around it…"*[57]

- Falconer, in acknowledging that York also knew it was wrongfully transferring secured assets, alluded to legal action the Note holders might take and the impact it could have on York's cooperation to fund payment of the Notes. Pilgrim inquired, *"Are you saying it would be helpful to you when you go back to the New York guys if you had some sense that there was a threat that they're going to get pulled into a lawsuit for wrongful conveyance or for conversion of those assets?"* Falconer replied, *"At some point Buddy, it doesn't hurt."*[58]

- Pilgrim, referring to the fact that the Notes were overtly represented as *"bridge loans"* to the equity raise – which was to fund repayment of the Notes – stated, *"Our loan was a big part of… the bridge to the equity raise, which was the whole purpose of our loan(s) in the beginning."* To this Falconer confirmed, *"Right. Right."* [59]

- Pilgrim continued, *"York needs to realize that York is at risk in this deal."* To which Falconer replied, *"I, uh, uh, I realize it."*[60]

- Pilgrim mentioned that **York even defrauded their own investors, (in SIBSI)** by failing to reveal to them that it knowingly orchestrated the transfer of secured assets without a release of lien, to which Falconer agreed, replying, *"Uh huh, strong case. Strong case."*[61]

- Finally Falconer summed up the situation stating, *"I answer to you guys as investors, I answer to York as the investors' investor. I (indistinguishable) have personal liability in here as an officer of the company. So you have my personal attention. Absolutely. Trust me, I know that."*[62]

---

[57] *Id.* at index 290-294 (emphasis added).
[58] *Id.* at index 330-335 (emphasis added).
[59] *Id.* at index 372-378 (emphasis added).
[60] *Id.* at index 562-565 (emphasis added).
[61] *Id.* at index 565-575 (emphasis added).
[62] *Id.* at index 586-591 (emphasis added).

**Z.**   **Tortious Interference and Fraudulent Transfer**

100.   Defendant York formed SIBSI for the specific purpose of funding the major capital raise ScanTech had been touting since 2010 (and to which the Notes were represented to the Lenders as being a *"bridge"*).   Defendant York exercised total control over its investment vehicle, SIBSI, **making Defendants York and SIBSI totally indistinguishable from one another** with regard to all actions taken regarding ScanTech, IBS, New ScanTech, their businesses, and the Notes and related Secured Assets.   Defendants York and SIBSI conspired to exercise control over Defendants New ScanTech, ScanTech and IBS, orchestrating and implementing the scheme whereby IBS transferred all of its assets to New ScanTech, and ScanTech transferred all of its security related assets to New ScanTech – **with each transferring only selective portions of its debt, specifically excluding the Notes, as directed to do so by York and SIBSI**. These asset transfers left ScanTech and IBS devoid of potential operating revenue, physical and human resources, working capital and fixed assets, and rights to utilize certain patents and business licenses to pursue security related business; so as to knowingly and intentionally leave ScanTech and IBS unable to pay the Notes.

101.   The aforementioned asset transfer scheme, which was done also through collusion, conspiracy and cooperation with the officers and directors of

Defendants ScanTech and IBS (Defendants Cowart, Sutherlin, Falconer, Redmond and others), included the fraudulent transfer of the assets in which the Lenders held secured interests, and was done without any payoff of the liens (the Notes) and without any release otherwise by the Lenders of their secured interests.  At all times during the orchestration and implementation of the asset transfer scheme, Defendants York, SIBSI, New ScanTech, ScanTech, IBS, their officers, directors and authorized agents knew that the Secured Assets were being transferred in breach of the written terms of the Security Agreement and in breach of the fiduciary duty owed the Lenders by the officers and directors of ScanTech and IBS with respect to the Security Agreement and the Secured Assets.[63]   Defendants York's and SIBSI's actions in designing and implementing the breach also amounts to tortious interference with the Lenders' contracts (the Notes and Security Agreements).

## AA.   **The Offer to Exchange**

102.   At all times during their collusion and tortious interference, Defendants York and SIBSI knew of the terms of the defaulted Notes and related Security Agreements.   In fact, they referenced the Notes in the Operating

---

[63] The Limited Security Agreement document of Borrower, Section 4.4., states the fiduciary duty: "Grantor shall not take any action (or permit or consent to the taking of any action) that might materially impair the value of all or any portion of the Collateral o[r] the rights of Secured Party with respect to the Collateral."

Agreement for New ScanTech and in the Offer to Exchange Existing Debt Instrument (the "**Offer to Exchange**").[64]  The Offer to Exchange provided two particularly bad choices among which the colluding parties attempted to force the Lenders to choose – either of which would have resulted in a release of the Secured Interest and with no assurance of any forthcoming payment on the Notes.  In fact, the Offer to Exchange, when referring to any future potential for even a portion of each Note's principal to be paid, emphasized that any such potential "contingent" payment obligation would **not even be recognized or treated as a debt** obligation of Defendant New ScanTech.[65]

---

[64]  Preamble/WITNESSETH section of the Amended and Restated Limited Liability Company Agreement of SIBS, wherein the Lenders were referred to as *"…certain debtholders of ScanTech Holdings and IBS holding junior secured convertible notes…"* and as *"**Bridge Investors**"*. (emphasis added)  *See also* Offer to Exchange Existing Debt Instrument, for Note holders, June 2011, written in negotiation with York and SIBSI specifically to obtain the release of the secured assets from the Lenders, in exchange for certain options which were highly unfavorable to the Lenders, acknowledging on page 1, *"Your notes may be secured by funds to be received by the Company's contract in Abu Dhabi, which security will be released by the election of one of the options described."*(emphasis added).

[65]  Offer to Exchange Existing Debt Instrument, page 3 ("*The fixed contingent payment obligation will not be treated as debt by SIBS, as these are fixed payment obligations payable only upon the occurrence of certain events."*  The *"events"* include *"…when and if the Board of Directors of [New Scan Tech] determines [New Scan Tech] has cash available…."*)(emphasis added). **These York/SIBSI contrived terms of payment mandate that no interest ever be paid on the Notes**, while they **mandate preferred dividends be paid to SIBSI** and **non-diutible equity stakes** in New ScanTech be given to insiders.

103.   Defendants York and SIBSI knew they were at risk if they did not achieve release of the Security Interests.   The Offer to Exchange stated that Defendants York and SIBSI had, at their sole option, the ability to not fund the investment in Defendant New ScanTech if *"all"* of the Lenders did not choose one of the release options.[66]   Part of the **threat** Defendant York used **to bully** most of the so-called *"Friends and Family"* note holders into submission was that if Defendants York and SIBSI chose to go forward without release of all of the Secured Interests, **IBS would be stripped of all of its assets**[67] and left worthless. This threat was made in spite of the Note holders' secured interests in the transferred assets.

104.   The asset transfer left Defendant IBS insolvent, with substantial debt (the Notes), no meaningful assets, and no source of income.   It left Defendant ScanTech in similar shape.

---

[66] Offer to Exchange Existing Debt Instrument, page 2-3: *"Unless all note holders elect an option (to release their Security Interest) or the proposed new investor (SIBSI, i.e. York) waives this condition, the new investment will not be consummated."*  (emphasis added).

[67] *Id.* ("If you decide to take neither of the alternatives and the new investor waives the closing condition described above, your note will remain an obligation of ScanTech, which will be a member of SIBS [New ScanTech].   Note that ScanTech is not an operating entity and will only generate cash from the operations of SIBS [New ScanTech] or other affiliates.   In some cases, your note will also be an obligation of the old IBS, which will **no longer have any meaningful assets and will not be an operating entity**.")(all emphasis added)

105.   Their threats worked with most holders of the Junior Secured Convertible Promissory Notes.   After the fact, Zachary Taylor confirmed to Pilgrim that *other than* the $450,000 of Notes held by Plaintiffs, only $18,581 (0.94%) out of $1,958,197 of notes had yet to make an election as of June 9, 2011.[68]   This shows Defendants York/SIBSI were successful in bullying virtually all other note holders into taking a voluntary "cram-down" of their notes—leaving only the risk associated with Plaintiffs going forward.   Plaintiffs chose neither option, reserving all of their rights under the Notes and Security Agreements.

## BB.   <u>The New ScanTech Operating Agreement</u>

106.   Defendants York/SIBIS, New ScanTech, ScanTech, IBS, their officers, directors and authorized agents also knew they were conspiring to strip IBS bare of its assets while leaving the company holding select portions of its debt – namely the Notes – and no ability to pay such debt.   The New ScanTech Operating Agreement referred to this fact, stating: (with emphasis added)[69]

> *"WHEREAS, the Company [New ScanTech] and IBS entered into that certain Contribution and Assumption Agreement, dated May [ ], 2011, pursuant to which IBS contributed <u>substantially **all** of its assets and **certain** liabilities</u> to the Company…"*

---

[68] Taylor email of June 9, 2011 at 10:51 p.m. to Pilgrim delineating the status $1,958,197 of notes.
[69] Preamble/WITNESSETH section of the <u>Amended and Restated Limited Liability Company Agreement of SIBS</u>.

107.   The same Operating Agreement also forced the transfer of most of the assets of ScanTech to New ScanTech, leaving ScanTech similarly unable to pay the Notes, because it would "not [be] an operating entity and will only generate cash from the operations of [New ScanTech] (whose distributions of cash were totally controlled by York/SIBSI) or other affiliates."[70]

108.   Taylor, the lead investment banking agent for Defendants ScanTech and IBS in dealing with Defendants York/SIBSI, on December 9, 2011, during a ScanTech/IBS/New ScanTech update meeting in Georgia, discussed the risk (liability) that Defendant York **knew it assumed** with the asset transfer scheme it designed.  He told Pilgrim, *"The [York/SIBSI] paperwork was documented to recognize the security interest that you had in the AD business.*[71]  In a letter to Pilgrim, written on behalf of ScanTech, in regard to the Pilgrim Plaintiffs' demand for payment in full of all principal and interest on the Pilgrim Notes, Taylor stated, *"We (ScanTech) do not question the reasonableness or rationale for your demand*

---

[70] *See* <u>Offer to Exchange Existing Debt Instrument</u>, page 2-3. The *"affiliates"* referred to likewise generate no cash and were not a part of the business prospectus presented to the Lenders by the Borrower, and were not entities that ScanTech had the funding or personnel to operate without access to the capital raise – which York denied.   York demanded that ScanTech employees (all of whom were transferred to New ScanTech) devote all of their paid man-hours to New ScanTech, leaving the *"affiliates"* with no funding, employees or assets to pursue other revenue streams or lines of business.

[71] Notes/Minutes taken at ScanTech/IBS/New ScanTech Informational Meeting, Atlanta, Georgia on December 9, 2011.

<u>**PLAINTIFFS' ORIGINAL COMPLAINT—PAGE 58**</u>

*for payment in full at this time.  The loans were… offered by you… based on good faith beliefs and expectations relating to the company…."*[72]

**CC.   Preferential Treatment of Insiders and Self-Dealing**

109.  Defendants Cowart, Redmond, Falconer, Sutherlin, Blackwell and other officers and Directors of Defendants ScanTech, New ScanTech and IBS conspired with Defendants York/SIBSI to enter into the aforementioned illegal asset transfer schemes.  In exchange they all received preferential, self-dealing treatment as a part of the transaction.

110.  The select portions of aforementioned debt that were assumed and paid by Defendant New ScanTech included the $4.82 million bank loan that was guaranteed by Defendant IBS,[73] and also guaranteed individually by Defendants Cowart, Redmond, Falconer, Blackwell and other insiders of the Borrower. Defendants Cowart, Redmond, Falconer, Blackwell, Sutherlin and other insiders conspired together along with Defendants York/SIBSI to have the insider-guaranteed debts paid with York/SIBSI funds, while throwing the Lenders' $450,000 of principal and all unpaid interest under the bus.  The preferential

---

[72] Taylor letter of September 28, 2011 to Pilgrim regarding:  *Notes Payable by ScanTech Holdings, LLC.*
[73] Defendant Cowart is also a direct member in Defendant IBS and the largest individual owner of IBS apart from ScanTech, and he thereby benefits doubly from any release of IBS from a guaranty of ScanTech and IBS debt.

treatment and self-dealing of insiders fails to meet the standards of fiduciary duty owed to the Lenders.

111.   These Defendants also conspired to structure the New ScanTech deal so that officers, directors, founders and other key insiders of Defendants ScanTech and IBS were set up to participate in the sharing of a 15% non-dilutable equity stake in Defendants New ScanTech.   While it is not unusual for a venture capital funding deal to include a modest equity stake for the officers and key employees of the business—as a performance incentive—it is unheard of to have such an equity stake be non-dilutable and to <u>also</u> go to board members, directors and founding members of the entity, who are not mission-critical to the success of the business.

112.   Defendants Cowart and Redmond are among the non-mission-critical, non-employee, non-industry-expert persons who conspired with Defendants York/SIBSI to subvert the Notes while making themselves and their good friends, Defendants Falconer and Sutherlin, eligible for the non-dilutable equity stakes. There is no evidence that these self-dealing insiders ever offered to accept a lower personal equity stake, or a dilutable equity stake in New ScanTech in exchange for Defendants York/SIBSI agreeing to include the Notes in the acceptable use of the proceeds of the York/SIBSI capital raise.   To the contrary, they conspired together with York/SIBSI to specifically *exclude* the Notes from eligibility for payment.

<u>PLAINTIFFS' ORIGINAL COMPLAINT—PAGE 60</u>

113.   The prospectus and investment documents upon which York relied, and by which it secured its investors in SIBSI, and which prescribed the self-dealing preferential debt retirement and non-dilutable equity stakes for insiders (while scheming to not pay the Notes), projects a **$409.4 million profit** for Defendant New ScanTech by 2014.[74]   It is unconscionable that the parties conspiring to not pay a mere $450,000 of Notes, plus interest, from the proceeds of a $25,000,000 capital raise, would not and could not provide for the payment of $450,000 of Notes, plus interest, given that all such parties were investing on the reasonable expectation of reaping $409.4 million in profits in only five years.

114.   The value of the 15% non-dilutable equity stake **granted to** the self-dealing insiders was projected to be worth tens of millions of dollars.   While Defendants York/SIBSI may have wanted to give the insiders plenty of incentive to perform well, no one can credibly argue that the insiders would not have worked just as hard to have received a slightly smaller equity stake, allowing York/SIBSI to keep the difference, if York/SIBSI would just permit the Notes to be paid from the proceeds of the equity raise.   Yet the self-dealing insiders, Defendants Cowart, Redmond, Blackwell, Falconer, Sutherlin and others, conspired and agreed

---

[74] *See* Slide 31, Revenue Snapshot, Cumulative Returns for 2014 shown in "Overview of Series (A) Investment Opportunity, ScanTech Identification Beam Systems" presentation prepared by Taylor for York/SIBSI.

together with Defendants York/SIBSI to *exclude* the Notes and to *include* the self-dealing guaranteed debt repayment and non-dilutable equity stakes.

**DD.**   **Conspiracy and Collusion to Destroy Secured Assets**

115.   Furthermore, Defendants York/SIBSI intentionally destroyed the value of the receivables related to the AD business (that in which Plaintiffs hold a secured interest), by directing Defendant New ScanTech to <u>not</u> engage in business activities which were necessary to complete the sale to AD, and by directing New ScanTech to <u>not</u> spend monies budgeted for the AD Purchase Order ("**P.O.**") fulfillment.   Defendants York/SIBSI knew that fulfillment of the AD P.O. would result in $1,250,000 of revenue, but it also knew that Plaintiffs held a secured interest in such revenue and could obtain it in satisfaction of the past due principal and interest on the Notes and for costs related to the default and breach of contract.

116.   The New ScanTech budget upon which Defendants ScanTech and IBS based their solicitation of the York/SIBSI capital raise, and upon which Defendants York/SIBSI based its responsive capital investment in Defendant New ScanTech, specifically set forth $1,041,018 in budgeted uses of funds for fulfillment of the AD P.O.[75]   Defendants York/SIBSI initially *agreed* to this budget

---

[75]   *See:* "<u>SCANTECH IDENTIFICATION BEAM SYSTEMS SERIES (A) PREFERRED INDICATIVE INVESTMENT TERMS</u>" presentation document prepared by Taylor for York/SIBSI investors, page 9, Appendix B, "USES OF

amount for completion and fulfillment of the AD P.O., because it anticipated that the scheme to force the Lenders to release their lien and secured interests in the AD revenues would be successful – and upon such release, Defendant New ScanTech (and thereby Defendants York/SIBSI and the Defendant insiders) would reap all of the direct and immediate benefit of a completed sale to AD.  However, after the secured Lenders refused to voluntarily take the cram down offers and elected instead to keep in place their secured interests in the AD business, Defendants York/SIBSI knew that most of the revenue from a completed sale to AD would go instead to the secured Lenders in payment of principal and interest on the Notes.

117. Therefore, once it took control of Defendant New ScanTech, Defendants York/SIBSI **prevented** New ScanTech from expending such budgeted amounts toward fulfillment of the AD P.O., and *instead* Defendant York instructed New ScanTech to *"focus like a laser"* only on its potential U.S. business prospects with the TSA to the neglect of the AD P.O.  Specifically, Defendants York/SIBSI directed New ScanTech to: (i) not construct the units budgeted for in the investment document (ii) not post performance bonds required for fulfillment of

---

FUNDS", specifying $1,041,018 for *"Budget for Abu Dhabi Beta P/O/ Fulfillment"*.  *See also:* Slide 39, Capital Requirements, Uses of Cash, specifying $1,041,018 for *"Budget for Abu Dhabi Contract Fulfillment"* in "Overview of Series (A) Investment Opportunity, ScanTech Identification Beam Systems" presentation prepared by Taylor for York/SIBSI.

AD P.O., and (iii) <u>not</u> otherwise pursue reasonable negotiations and equipment modifications necessary for fulfillment of the P.O., which would have resulted in the A/R and thereafter in the collection of $1,250,000 of cash, in which Plaintiffs held a secured interest.  Simply put, Defendants York/SIBSI did not want capital that it invested in New ScanTech to be used to assist in completing a budgeted sale to AD from which a significant portion of the proceeds would go to repay the Notes.  It would rather not have the sale at all, than follow through with the initially agreed to $1,041,018 budgeted use of funds and end up with over half of the revenue going to pay the Notes and interest thereon.  So, it *tortiously interfered* in the AD business contract underlying Plaintiffs' lien and in the Security Agreement contract, willfully destroying the values thereof.[76]

## <u>COUNT I</u>

### <u>Breach of Contract (Promissory Notes)</u>

### <u>(Against Defendants ScanTech and IBS)</u>

118.   Plaintiffs repeat and reallege the preceding allegations as if fully set forth herein.

---

[76] This is in direct violation of the terms of the <u>Limited Security Agreement</u> contract between the Lenders and the Borrower, which states the fiduciary duty in Section 4.4., as follows: *"Grantor shall not take any action (or permit or consent to the taking of any action) that might materially impair the value of all or any portion of the Collateral o[r] the rights of Secured Party with respect to the Collateral."*

119.   In 2010, ScanTech and IBS executed the Notes to Plaintiffs in the total sum of $450,000, with interest accruing thereon at a rate of 8% per annum until Maturity, which was six months after the execution of each of the Notes. Upon default, the interest rate on the Notes increased to 15% per annum.

120.   Plaintiffs are holders of the Notes, which makes them persons entitled to enforce those instruments within the meaning of O.C.G.A. § 11-3-301.

121.   ScanTech and IBS defaulted on each of the Notes by failing to make the payments due on them.

122.   ScanTech and IBS never made any payments of principal or interest on any of the Notes and have affirmed the default status of each Note by issuing the default Cashless Warrants to Plaintiffs.

123.   ScanTech and IBS owe Plaintiffs $450,000 in principal, plus interest at the rate of 8% per annum until Maturity, plus interest at the rate of 15% per annum accruing from Maturity until paid.

124.   Plaintiffs have demanded payment of the Notes multiple times to no avail.

125.   Under the terms of the Notes, ScanTech and IBS agree to pay Plaintiffs' reasonable attorneys' fees in connection with collection efforts.

126.   ScanTech and IBS have forced Plaintiffs to sue where no bona fide

controversy exists and have caused Plaintiffs unnecessary trouble and expense in their attempt to recover for their damages.

127.   Plaintiffs are entitled to recover from ScanTech and IBS all expenses of litigation, including reasonable attorneys' fees, under the terms of the Notes and other applicable law.

## COUNT II

### Tortious Interference with Contractual Relations

### (Against Defendants New ScanTech, SIBSI and York)

128.   Plaintiffs repeat and reallege the preceding allegations as if fully set forth herein.

129.   Through their improper actions and wrongful conduct, and without privilege, Defendants York, SIBSI and New ScanTech (which was controlled totally by Defendants York and SIBSI) induced breaches of the contractual obligations that Defendants ScanTech and IBS owed to Plaintiffs in the Notes and the Security Agreements.

130.   Defendants York, SIBSI and New ScanTech were strangers to the contracts set forth in the Notes and Security Agreements and had no legitimate economic interests therein.

131.   Defendants acted purposely and with malice and with the intent to injure Plaintiffs.

132.   Defendants' tortious conduct proximately caused damage to Plaintiffs.

## COUNT III

### Fraudulent Transfer Under O.C.G.A. § 18-2-70, *et seq.*

### (Against Defendants ScanTech, IBS and New ScanTech)

133.   Plaintiffs repeat and reallege the preceding allegations as if fully set forth herein.

134.   By virtue of the Notes, Plaintiffs were and are "creditors" of ScanTech and IBS were and are "debtors" within the meaning of O.C.G.A. §18-2-74(a).   These relationships have existed since the execution of the Promissory Notes in 2010.

135.   In 2011, Defendants arranged to transfer substantially all of the assets of IBS to New ScanTech—including the AD A/R they had pledged to Plaintiffs as security on the Notes—with actual intent to hinder, delay, and defraud Plaintiffs in their efforts to obtain repayment of the debt.   This intent is evidenced by, *inter alia*, the "Offer to Exchange Existing Debt Instrument" which Defendants sent to Plaintiffs (and other debtholders) in 2011.

136.   Thus, the transfer of substantially all of IBS's assets to New Scan Tech constitutes a fraudulent transfer within the meaning of O.C.G.A. § 8-2-70, *et seq.*, and Plaintiffs, as creditors, are entitled to the remedies—including injunctive relief and damages against both the transferors and transferees—set forth therein.

## COUNT IV

## Breach of Fiduciary Duties

## (Against Defendants Cowart, Falconer, Sutherlin, Redmond and Blackwell)

137.   Plaintiffs repeat and reallege the preceding allegations as if fully set forth herein.

138.   Defendants Cowart, Falconer, Sutherlin, Redmond and Blackwell are collectively referred to as the "Officer and Director Defendants."

139.   When a company is solvent, the officers and directors of the company have fiduciary duties of care, loyalty, disclosure, good faith and fair dealing, and are liable to equity holders for breaches thereof.  When a company is insolvent or approaching insolvency, however, under applicable statutory and common law, officers and directors have those same fiduciary duties to the company's creditors. If the company were to be liquidated, secured creditors would be in the best position (from a liquidation hierarchy point of view), and equity holders would be in the worst position.  Thus, when a company is facing potential liquidation,

officers' and directors' fiduciary duties to equity holders must give way to their fiduciary duties to creditors, in recognition of the fact that creditors are the beneficiaries of an insolvent company's value.

140.   In 2011, ScanTech and IBS were approaching insolvency (if not insolvent).  This is evidenced by the following:

### a.   Financial Statements Indicate Negative Net Equity and a Net Loss

The **Balance Sheets** for Defendant ScanTech for the Periods Ending 12/31/2010 and 12/31/2011 stated a negative Net Worth of ($3,635,058), and ($3,700,877), respectively for each period as follows:

| Category | 12/31/2010[77] | 12/31/2011[78] |
|---|---|---|
| Current Assets[79] | $6,043,262 | $1,729,761 |
| Non-Current  Assets | $      34,302 | $      21,062 |
| Total Assets | $6,077,564 | $1,750,823 |
| Current Liabilities | $9,712,622 | $5,451,700 |
| Long Term Liabilities[80] | $         0 | $          0 |

---

[77] 12/31/2010 Balance Sheet made available to Plaintiffs in June 2011.

[78] 12/31/2011 Balance Sheet made available to Plaintiffs in the Spring of 2012.

[79] Current Assets include *"Intercompany Receivables"* in the amounts  *$5,807,238* on 12/31/2010 and *$1,337,440,* on 12/31/2011, virtually all of which is from partially owned subsidiary IBS, which is also insolvent, has been stripped of assets, and has no income, and is not an operating entity with capacity to pay such receivables.  Reductions of assets from 2010 to 2011 reflect transfers of assets out of ScanTech concurrent with the York/SIBSI capital raise June 1, 2011.

[80] 2010 and 2011 Balance Sheets for ScanTech contain no Long Term Liabilities, which indicates that each debt of the company, including previous Long Term Debt, has defaulted and/or otherwise become past due or is due and payable in the

| | | |
|---|---|---|
| Total Liabilities | $9,712,622 | $5,451,700 |
| **Total Equity** | **($3,635,058)** | **($3,700,877)** |
| Total Liabilities & Equity | $6,077,564 | $1,750,823 |

The preliminary **Income Statement** for ScanTech for Year Ending 12/31/2011[81] indicated zero income for 2011 and a net loss of ($551,480).

The **Balance Sheets** for Defendant IBS for the Periods Ending 11/30/2010 and 11/30/2011 stated a Net Worth of ($1,422,035) and $1,361,689, respectively for each period as follows:

| Category | 11/30/2010[82] | 11/30/2011[83] |
|---|---|---|
| Current Assets[84] | $5,630,594 | $1,487,572 |
| Non-Current  Assets | $2,435,474 | $1,533,615 |
| Total Assets | $8,067,067 | $3,021,188 |
| Current Liabilities | $9,489,103 | $1,659,499 |
| Long Term Liabilities[85] | $        0 | $           0 |

---

short term.  Reductions of liabilities from 2010 to 2011 reflect *select* debt paid or otherwise dismissed concurrent with the York/SIBSI capital raise June 1, 2011.

[81] Preliminary Income Statement, provided in mid 2012 is the only Income Statement available.

[82] 11/30/2010 Balance Sheet was made available to Plaintiffs in June 2011.

[83] 11/30/2011 Balance Sheet was made available to Plaintiffs in the Spring of 2012.

[84] Current Assets include *"Intercompany Receivables"* in the amounts  *$2,070* on 11/30/2010 and *$1,134,221 on 11/30/2011,* virtually all of which is from major Member ScanTech, which is also insolvent, has been stripped of assets, and has no income, and is not an operating entity with capacity to pay such receivables.  Also included is *"Inventory"* of *$5,592,187* in 2010 and *$276,749* in 2011, the reduction of which reflects transfers of assets out of IBS to New ScanTech concurrent with the York/SIBSI capital raise June 1, 2011.

[85] 2010 and 2011 Balance Sheet for IBS contain  no Long Term Liabilities, which indicates that each debt of the company, including previous Long Term Debt, has defaulted and/or otherwise become past due or is due and payable in the short term.

| | | |
|---|---|---|
| Total Liabilities | $9,489,103 | $1,659,499 |
| **Total Equity** | **($1,422,035)** | **$1,361,689** |
| Total Liabilities & Equity | $8,067,067 | $3,021,188 |

The preliminary **Income Statement** for IBS for Year-to-Date Month-Ending 11/30/2011[86] indicated zero income for 2011 and a net loss of ($1,155,203).

### b. Inability to Pay Its Debts, Including Vendors and Lenders

The ScanTech *Letter to Members* June 30, 2011 from Defendant CEO Falconer stated, "From mid-2010 and throughout 2011, the Company [ScanTech and IBS] had repeated brushes with total insolvency, and was unable to pay for many of the ordinary operating expenses, including rent, taxes, and executive payroll. [On June 1, 2011] the Company was in default with many creditors, some of which were critical vendors that had stopped supplying goods and services… several creditors had actually commenced litigation, including First Citizens Bank," whose $4.82 million in loans had been in technical default since January 15, 2010 and in formal default since September 7, 2010. Furthermore, Plaintiffs' Notes totaling $450,000 in principal, plus all accrued interest, were more than 180 days past due as of March 4, 2011 and April 28, 2011, and in formal default.

---

Reductions of liabilities from 2010 to 2011 reflect *select* debts paid or otherwise dismissed concurrent with the York/SIBSI capital raise June 1, 2011.

[86] The 11/30/2011 Year-to-Date Month-Ending Preliminary Income Statement, provided to Plaintiffs in mid 2012 is the only Income Statement provided.

### c.  Violation of Loan Covenants Resulting in Debt Acceleration

Defendants ScanTech and IBS were in breach of numerous contractual obligations on Plaintiffs' Notes and related Security Agreements leading to such Notes being in default status and immediately due and payable.  ScanTech and IBS were also jointly liable for the First Citizens Bank loan of $4.82 million which was in formal default and accelerated.  Other loans and credit obligations were likewise past due and in default.

### d.  Unable to Pay Debts When Due

Defendants ScanTech and IBS were still in the R & D stages of product development and had no sales or sources of operating revenue from which to pay ordinary debts or operating expenses.  After the material assets and business prospects were transferred to New ScanTech and the funds from the York/SIBSI major institutional capital raise were directed to New ScanTech, there was even less ability for Defendants ScanTech and IBS to pay debts.

### e.  Inability to raise additional equity.

Defendants Falconer, Cowart, Redmond, Sutherlin and the other officers, directors and authorized agents of ScanTech and IBS colluded with York and SIBSI to raise $25,000,000 of institutional capital through SIBSI and have it contributed into New ScanTech, on the basis of concurrently transferring

substantially all of the assets and business prospects out of ScanTech and IBS; thus leaving ScanTech and IBS unable to raise additional capital for any residual business to be conducted in or through them.  Furthermore, Falconer informed Plaintiffs on a conference call in 2012 that ScanTech and IBS were unable to raise additional capital, due to having little or no business prospects within them. ScanTech's and IBS's inability to raise cash was so severe that they were late issuing K-1's to members in 2012 for the 2011 tax year, due to insufficient cash to pay accountants for preparation of year-end financial and tax statements.

141.   Therefore, the Officer and Director Defendants owed a fiduciary duty to Plaintiffs and other creditors.

142.   The Officer and Director Defendants were required to exercise good faith and subordinate their own selfish interests to those of Plaintiffs where their interests conflicted.  Where it appears that a director or officer has obtained any personal profit from dealing with the corporation, and the transaction is drawn into question, the burden is upon the director or officer to show that the transaction has been fair, open and in the utmost good faith.

143.   As alleged herein, the Officer and Director Defendants have breached, and/or aided other Defendants' breaches of, their fiduciary duties to the creditors of ScanTech and IBS (including Plaintiffs) by acting to cause or facilitate the

fraudulent transfer of IBS's assets to New ScanTech when such transfer was not in the best interests of those creditors but was in the best interests of the Officer and Director Defendants. Because of their self-dealing, these Defendants each received significant personal benefits as a result of the fraudulent transfer that they otherwise would not have received, including preferential equity positions in New ScanTech, continued employment on lucrative terms, and relief from multi-million dollar debt guarantees on which they were personally liable.

144. Because the Officer and Director Defendants have knowingly or recklessly breached their fiduciary duties in connection with the fraudulent transfer, and/or are personally profiting from the same, the burden of proving the inherent or entire fairness of the transaction, including all aspects of its negotiation, structure, and terms, is borne by these Defendants as a matter of law.

145. In addition, the Officer and Director Defendants have violated their fiduciary duties to Plaintiffs, either individually, or in concert with each other, or as aiders and abetters of the others, by committing at least the following acts:

    a.    They preferred their own interests to the financial detriment of creditors;

    b.    they structured the fraudulent transfer of IBS's assets to New ScanTech with actual intent to hinder, delay, and defraud Plaintiffs' efforts to seek repayment of the debt; and

<u>**PLAINTIFFS' ORIGINAL COMPLAINT**</u>—**PAGE 74**

c.    they agreed to a transaction on terms unfavorable to the creditors and not reflective of the true value of IBS's assets.

146.    The Officer and Director Defendants knowingly breached their fiduciary duties to creditors and caused damages to Plaintiffs, and each of them should be deterred from committing such wrongs in the future by a sufficient award against him of punitive and exemplary damages.

147.    Plaintiffs are entitled to all possible relief at law and in equity, including being placed in the respective positions they were in prior to the breaches herein alleged, plus interest, attorneys' fees, and costs.

## COUNT V

### Aiding and Abetting Breach of Fiduciary Duties

### (Against Defendants New ScanTech, York and SIBSI)

148.    Plaintiffs repeat and reallege the preceding allegations as if fully set forth herein.

149.    As set forth herein, Defendants York, SIBSI and New ScanTech (which was controlled totally by Defendants York and SIBSI), through improper action and wrongful conduct and without privilege, acted to procure a breach of the Officer and Director Defendants' fiduciary duties to Plaintiffs.

150.    At all times, Defendants York, SIBSI and New ScanTech were all aware of the fiduciary nature of the relationships among Plaintiffs and the Officer

and Director Defendants.

151.   Defendants York, SIBSI and New ScanTech acted purposely and with malice and the intent to injure.

152.   The wrongful conduct of Defendants York, SIBSI and New ScanTech did procure a breach of the Officer and Director Defendants' fiduciary duties to Plaintiffs.

153.   The wrongful conduct of Defendants York, SIBSI and New ScanTech proximately caused damage to Plaintiffs.

154.   Defendants York, SIBSI and New ScanTech acted jointly and in concert with the Officer and Directors Defendants in order to aid and assist the Officers and Director Defendants in breach of their fiduciary duties.

155.   As a result, Plaintiffs have suffered damages and are entitled to all possible relief at law and in equity.

## COUNT VI

### Negligence

### (Against the Officer and Director Defendants)

156.   Plaintiffs repeat and reallege the preceding allegations as if fully set forth herein.

157.   The Officer and Director Defendants had a duty to operate ScanTech and IBS in a careful and prudent manner as any reasonable director or officer acting under similar circumstances would do.

158.   By failing to discharge this duty, the Officer and Director Defendants have negligently operated ScanTech and IBS and have caused loss to Plaintiffs.

159.   The negligence of the Officer and Director Defendants is a proximate cause of Plaintiffs' loss.

## COUNT VII

## Receivership

## (Over Defendants ScanTech, IBS and New ScanTech)

160.   Plaintiffs repeat and reallege the preceding allegations as if fully set forth herein.

161.   As shown in Paragraph 140 above, Defendants ScanTech and IBS are insolvent by any definition.   On information and belief, Defendant New ScanTech is also insolvent.

162.   Plaintiffs' rights as secured creditors (and minority equity holders) cannot be fully protected without the appointment of a Court-supervised receiver.

163.   There is manifest danger of loss, destruction, or material injury to Plaintiffs' interests so long as Defendants control the operations and financial accounts of ScanTech, IBS, and New ScanTech.

## COUNT VIII

### Accounting

### (Of Defendants ScanTech, IBS and New ScanTech)

164.   Plaintiffs repeat and reallege the preceding allegations as if fully set forth herein.

165.   The proceeds from Plaintiffs' Notes were not used by ScanTech and IBS as Defendants represented they would be, and IBS's only meaningful assets, including the Secured Assets for Plaintiffs' notes, have now been fraudulently transferred to New ScanTech.  Plaintiffs request a Court-supervised accounting of the financial accounts of ScanTech, IBS, and New ScanTech and the use of these entities' funds by Defendants and/or any entities under their control, and the disgorgement of all fraudulently transferred assets, misappropriated funds, or unjust enrichment, together with prejudgment interest.

## COUNT IX

## Violation of the Georgia Uniform Securities Act of 2008 ("GUSA")

### (Against Defendant Frost, the First Liberty Defendants, and the Officer and Director Defendants)

166.   Plaintiffs repeat and reallege the preceding allegations as if fully set forth herein.

167.   Defendants Frost, the First Liberty Defendants and the Officer and Director Defendants were persons who offered to sell or sold a security issued by ScanTech and IBS (i.e., the Notes), which offer and sale was regulated by GUSA and the rules and regulations promulgated thereunder.

168.   Defendants' actions were part of a device, scheme or artifice to defraud and part of an act, practice or course of business that operates or would operate as a fraud or deceit upon a purchaser of said securities.

169.   Each of the false and misleading statements and omissions to state a material fact were made with knowledge by these Defendants.

170.   Plaintiffs did not know the true state of affairs at the time of the false and misleading statements and omissions described above.

171.   The violations of GUSA were done in such a way to hide and conceal the fraud.

172.   This action is brought within two years of the discovery of such fraud, as the statute of limitations was tolled during such time of concealment.

173.   The Officer and Director Defendants are not entitled to an indemnification or a limitation of liability, because the acts complained of in this Count IX, and in Counts X, XI and XII, are known violations of the law, and said Directors and Officers received improper personal benefit from their actions.

## COUNT X

## Fraud

### (Against Defendant Frost, the First Liberty Defendants, and the Officer and Director Defendants)

174.   Plaintiffs repeat and reallege the preceding allegations as if fully set forth herein.

175.   The Officer and Director Defendants had a fiduciary responsibility to Plaintiffs.  As such, there was a duty to disclose material facts in regard to the sale of the securities as alleged in the preceding Count.

176.   As shown above, numerous of the Defendants' statements and omissions were false and misleading when they were made to solicit the Plaintiffs' execution of the Notes.  Defendants knew these statements to be false and misleading or were reckless in not knowing.

177.   Defendants' statements and omissions were material and were made willfully by Defendants with an intent to deceive, mislead, and induce Plaintiffs to act.

178.   Plaintiffs, unaware of the truth, relied and acted upon such false and misleading statements and omissions and sustained a loss as a result.  The failure and omission to state material facts made the reliance reasonable.

## COUNT XI

### Negligent Misrepresentation

### (Against Defendant Frost, the First Liberty Defendants, and the Officer and Director Defendants)

179.   Plaintiffs repeat and reallege the preceding allegations as if fully set forth herein.

180.   These Defendants negligently supplied false and misleading information (including omissions of material information) to Plaintiffs.

181.   Plaintiffs justifiably and reasonably relied upon the false misleading information and suffered economic injury as a proximate result.

## COUNT XII

### Racketeering Influenced And Corrupt Organizations Act ("RICO")

### (Against Defendant Frost, the First Liberty Defendants,
### and the Officer and Director Defendants)

182.   Plaintiffs repeat and reallege the preceding allegations as if fully set forth herein.

183.   Each of the Plaintiffs is a "person" within the meaning of RICO, 18 U.S.C. §1961(3).

184.   Each of Defendant Frost, the First Liberty Defendants and the Officer and Director Defendants is a "person" within the meaning of RICO, 18 U.S.C. §1961(3).

185.   In order to solicit loans for ScanTech and IBS that would not be forthcoming if the true facts of ScanTech's and IBS's business, operations and value were known to the prospective lenders, these Defendants formed an association-in-fact that was an "enterprise" within the meaning of RICO, 18 U.S.C. §1961(4).

186.   The Defendants' RICO enterprise was an ongoing association of the Officer and Director Defendants and Frost and his First Liberty Defendants that had a structure and a purpose and that was organized in a manner amenable to hierarchical or consensual decision making.  The Officer and Director Defendants

created and approved materially false and misleading materials concerning the business, operations and value of ScanTech and IBS, including the Executive Summary and the Updated Executive Summary, that were knowingly provided to Defendant Frost and his First Liberty Defendants to use in fraudulently soliciting loans, the proceeds of which were used not as represented, but for the personal benefit of these Defendants and the perpetuation of the enterprise.

187.  Defendants' RICO enterprise was engaged in, and its activities affected, interstate and foreign commerce within the meaning of RICO, 18 U.S.C. §1962.

188.  These Defendants derived income directly and indirectly from a pattern of racketeering activity, as described above and below, that used, directly or indirectly, at least part of such income or the proceeds of such income to acquire interests in, establish and operate ScanTech, IBS and the RICO enterprise, in violation of RICO, 18 U.S.C. §1962(a).

189.  These Defendants engaged in "racketeering activity" within the meaning of 18 U.S.C. §1961(1) by using the United States mail and using the interstate telephone wires in Georgia to solicit loans from persons outside Georgia, including Plaintiffs in Tennessee and Texas, through a "scheme or artifice to defraud, or for obtaining money . . . by means of false or fraudulent pretenses,

representations or promises" in violation of 18 U.S.C. §1341 and §1343. These Defendants also used the mail and the telephone wires to conduct the enterprise's daily affairs.

190.   These Defendants performed their acts of racketeering activity with specific intent to defraud. The use of the mail and the telephone wires was integral to the operation of the enterprise, the fraudulent scheme, and the safeguarding of the benefits of the fraudulent scheme.

191.   The acts of racketeering activity alleged above constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961(5). The acts alleged were related to each other by virtue of the common participants, common victims (the Plaintiffs and the other so-called "Friends and Family" lenders), a common method of commission, and the common purpose and common result of obtaining loans ostensibly for ScanTech and IBS but at least in part for the benefit of these Defendants and the perpetuation of the enterprise.

192.   As a result of these Defendants' violation of RICO, Plaintiffs have been harmed.

## COUNT XIII

## Attorneys' Fees

## (Against All Defendants)

193.   Plaintiffs repeat and reallege the preceding allegations as if fully set forth herein.

194.   Defendants have forced Plaintiffs to sue where no bona fide controversy exists and have caused Plaintiffs unnecessary trouble and expense in their attempt to recover the amounts due them.

195.   Defendants have engaged in intentional and willful violations of law and have acted in bad faith in the course of dealings with Plaintiffs as set forth herein.   As such, Plaintiffs are entitled to recovery of attorneys' fees pursuant to O.C.G.A. §13-6-11 and other applicable law.

## COUNT XIV

## Punitive Damages

## (Against All Defendants)

196.   Plaintiffs repeat and reallege the preceding allegations as if fully set forth herein.

197. Defendants have forced Plaintiffs to sue where no bona fide controversy exists and have caused Plaintiffs unnecessary trouble and expense in

their attempt to recover for their damages.  Defendants' actions have been willful and intentional, fraudulent, wanton, and have been done with such entire want of care to raise the presumption of conscious indifference to consequences.

198.   In addition to the damages that naturally and normally flow from their claims, Plaintiffs are entitled to recover a sum in order to deter Defendants from similar conduct in the future.

199.   Because the acts alleged herein were willful, intentional and with a specific intent to harm, there is no limitation on the amount of punitive damages.

200.   Plaintiffs demand a trial by jury of all issues so triable.

WHEREFORE, Plaintiffs pray for judgment and relief as follows:

A.     that the Plaintiffs recover an amount of damages for their loss as proved at the time of trial;

B.     that the Plaintiffs recover interest for the loss of the use of their funds as a result of the allegations in this Complaint;

C.     that the Plaintiffs recover punitive damages to deter Defendants and others from committing similar actions in the future;

D.     that a mandatory injunction be entered reversing the 2011 transfer of the assets of Defendant IBS to Defendant New ScanTech;

E.     that a Court-supervised receiver be appointed with all powers necessary to collect or recover monies owed to Plaintiffs;

F.     that a Court-supervised accounting be ordered to determine the amounts wrongfully appropriated from Plaintiffs;

G.     that the Plaintiffs recover reasonable attorneys' fees and costs for the bringing and maintenance of this action;

H.     that the Plaintiffs have any and all other relief the Court may deem just and proper.

Respectfully submitted this 24th day of  May, 2013.

**Law Offices of David A. Bain, LLC**

 _/s/ David A. Bain_____
David A. Bain
Georgia Bar No. 032449
1050 Promenade II
1230 Peachtree Street, NE
Atlanta, Georgia  30309
Tel: (404) 724-9990
Fax: (404) 724-9986
dbain@bain-law.com

Gary D. Sarles
**Sarles & Ouimet**
370 Founders Square
900 Jackson Street
Dallas, Texas 75202
Tel: (214) 573-6300
Fax: (214) 573-6306
gsarles.sarleslaw.com